(No. 17554.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GIOVANI DASCOLA, Plaintiff in Error.

*Opinion filed October 28, 1926.*

1. CRIMINAL LAW—*when new trial should not be allowed to ascertain genuineness of dying declaration.* Where attorneys for the defendant, who are experienced in criminal cases, permit the introduction in evidence of copies of two written dying declarations and do not examine closely the originals produced later, a new trial will not be granted upon the affidavit of the attending physician that the deceased was unconscious when the second declaration was alleged to have been signed, where the attorneys, by examining the declaration, could have discovered its spurious character, because it purported to have been witnessed by parties who, according to evidence previously introduced, could not have been present.

2. SAME—*when a witness may be called by the court—cross-examination.* Where the State's attorney, in a murder trial, knows that a witness was present at the scene of the crime but has reason to doubt the veracity or integrity of the witness, he is not obliged to call such witness but the court may call him and leave him open for cross-examination by either side; but the court should exercise this right with great care and ought not to adopt the practice except where otherwise there may be a miscarriage of justice.

3. SAME—*when court may call defendant's daughter as a witness.* In a prosecution for murder the court may, at the request of the State, call as a witness the daughter of the defendant, who was with the deceased at the time he was shot, but the examination of the witness should be confined strictly to the occurrences at the time of the shooting, and the cross-examination and questions asked to impeach the witness should be confined strictly to matters which are material to the issue.

4. SAME—*witness cannot be impeached by immaterial matters.* A witness cannot be impeached upon an immaterial statement or cross-examined as to immaterial or irrelevant matters.

5. SAME—*when instruction defining murder and malice is improper in ignoring defense.* In a murder trial, an instruction in the language of the statute defining murder and express and implied malice, without referring to the defense that the shooting was done in the necessary defense of the defendant's wife, is improper, as it is but an abstract proposition of law and likely to mislead the jury.

6. SAME—*statements of witness out of court are admissible only for impeachment—instruction.* Testimony in rebuttal as to state-

ments made by a witness out of court and inconsistent with his testimony upon the trial is admissible only for the purpose of impeaching his credit and cannot be received as evidence of any fact touching the issue to be tried, as the witness' statement, under oath, upon the trial is the only proper evidence of the fact testified to; and in a murder trial the defendant is entitled to an instruction stating the above proposition, where the testimony in rebuttal to impeach his witness contains facts material and prejudicial to the defendant's case.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WALTER P. STEFFEN, Judge, presiding.

STEWART & O'BRIEN, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, CLARENCE E. NELSON, and FRANK MATOUSEK, of counsel,) for the People.

Mr. JUSTICE HEARD delivered the opinion of the court:

Plaintiff in error, Giovani Dascola, (also called John Dascola,) and Carmela Dascola, his wife, were indicted and tried in the criminal court of Cook county for the murder of Robert Killion. Mrs. Dascola was acquitted, while the plaintiff in error was convicted and his punishment fixed at twenty years in the penitentiary. A motion for a new trial was made and overruled and plaintiff in error sentenced in accordance with the verdict. The record is before this court for review upon writ of error.

On the evening of August 9, 1925, Minnie Dascola, aged eighteen, a daughter of John and Carmela Dascola, an employee of the Hyde Park telephone exchange, whose time for quitting work was nine P. M., not arriving at her home at 10657 Hoxie avenue at the usual time, her father and her brother, Tony, aged eleven, at about eleven P. M. started in search of her and went to the corner of Ninety-

fifth street and Commercial avenue, where she was ac-
customed to transfer from one street car line to another.
Shortly after arriving there they saw Minnie with the de-
ceased, Robert Killion, on the north side of Ninety-fifth
street, either in or near an automobile belonging to Daniel
Killion, a brother of the deceased.   About 11:30 P. M. the
deceased, while in the automobile, received two gun-shot
wounds.   He was taken to the South Chicago Community
Hospital, where he died at 8:20 the next morning as the
result of the wounds.   No witness for the State directly
identified plaintiff in error as the person who actually did
the shooting or testified to the actual situation of the parties
at the time of the shooting or as to how it actually occurred.

Rev. John A. Keating testified that on August 9, 1925,
at about 11:35 P. M. he got off a street car at Ninety-fifth
street and Commercial avenue and engaged in a conversa-
tion with officer Dailey at that corner; that he observed
an automobile about fifty feet west of Commercial avenue,
on the north side of Ninety-fifth street; that he heard two
shots from the north side of the automobile but did not
see any flashes; that before the shots were fired a woman
passed him back of Dailey; that he did not know who it
was; that she walked directly west and had time to get
there when the shots were fired; that after the shots were
fired he saw Dailey start running toward the automobile;
that he did not see anyone running from the automobile,
as he got under cover; that right after that Dailey came
around in front of the building with John Dascola, and
Dailey had his own revolver in his hand; that after that
he went over to the automobile, where the wounded man
was groaning in pain; that he did not know him but found
out later that his name was Killion.

James P. Dailey, for nine years a police officer of Chi-
cago, testified that on August 9, 1925, at about 11:10 P. M.,
he was on duty, in full uniform, at the corner of Commer-
cial avenue and Ninety-fifth street; that as he stood on the

northeast corner John Dascola came up to him and called him by name; that Dascola said, "Jimmie, I want you to call the wagon;" that he asked him to call the wagon to take "those two" to the police station; that at that time he didn't know who Dascola was talking about and asked him where they were, and Dascola said, "Down there," meaning a point about fifty feet west of Commercial avenue; that witness went to the place and found Robert Killion and Minnie Dascola; that she was standing by the left front fender of the Essex coach, facing east, toward Commercial avenue; that the left fender was toward the sidewalk,—the same side where the steering wheel was; that he asked them how they happened to get there, and Killion, whom he knew slightly, told him he went to the Hyde Park exchange to get a girl by the name of Nellie Alatta, but there was some confusion as to the hours she worked that night; that in the meantime Minnie came out and said that Nellie wasn't working that night, and that then he said that as he was going south he would drive her as far as Ninety-fifth street; that witness asked Minnie what time she quit work that night, and she said 10:30 P. M.; that he then told Dascola there was no ground to call the wagon; that then Dascola went into the restaurant on the corner for about two minutes while witness talked to Minnie and Killion; that Dascola said he just called up his wife to take the girl home; that witness stayed around there about ten minutes talking to them; that he asked the girl if Killion had ever insulted her, and she said, "Not the least;" that witness told Dascola it wouldn't be very wise to lock the girl up and take her to the police station like that; that Dascola walked to the corner and witness left Killion and Minnie in the machine; that in the meantime Father Keating came along, and witness was talking to him about two minutes when Mrs. Dascola got off a north-bound street car that travels on Commercial avenue; that the machine at that time was about fifty feet west of

witness and Keating; that Mrs. Dascola got off the car about one hundred feet north of Ninety-fifth street and came by the corner where witness was; that he heard a little commotion and someone called his name; that then he heard two shots, and as he ran to the machine he saw Dascola, in his shirt sleeves, running down the alley; that the shots appeared to come from the direction of the machine; that Dascola ran back of the restaurant; that witness started after him—about fifteen feet behind him; that as he ran after him he fired two shots in the direction of his legs; that Dascola went north for about fifty feet and then turned east again, along the side up on Commercial avenue; that Dascola came east from the alley to Commercial avenue and ran a short distance on Commercial avenue when witness apprehended him; that he searched him for a gun and couldn't find any; that nothing was said by Dascola immediately after he was apprehended; that it was about twenty minutes between the time witness first spoke to Dascola and his wife's arrival; that John Miller handed him a gun, which he identifies as the gun in evidence; that at the time it was handed to him there were two empty shells and three loaded shells in it; that when he ran after Dascola he didn't stop to look whether or not anyone in the automobile had been shot, nor did he observe whether anyone was near the automobile just before Dascola commenced running away from him; that he saw the deceased make a written statement and was present when he signed it, at 12:20; that Dascola was there that evening for some little time, in his shirt sleeves; that he had no revolver to witness' knowledge; that he figures he didn't have any in his hip pocket; that if he had had a revolver that night when he first saw him witness would not have seen it, but he admitted that when testifying as a witness at the coroner's inquest he made this answer: "He was in his shirt sleeves, and if he had a gun I would have seen it;" that he did not see a revolver in Dascola's hand that night nor did

he see Mrs. Dascola with a revolver in her hand; that at no time did he hear either Dascola or Mrs. Dascola make any threats against Killion; that he did not know what happened before the shots were fired, as he was not looking at the machine.

Edward W. Thomasson, called as a witness on behalf of the State, testified that he was thirty-eight years of age and employed as superintendent for the Calumet Coal Company; that on August 9, 1925, between 11:30 P. M. and midnight, he was on Ninety-fifth street and Commercial avenue, driving his automobile with his family west on Ninety-fifth street; that when he arrived at the corner of those streets he saw the fire of two shots and heard two shots fly up in the alley; that he observed a machine fifteen or twenty feet ahead of him; that he stopped when he heard the first shot; that he did not see who fired the shots; that he jumped out of his machine and went to the other car, where he found Robert Killion, whom he had known all his life; that he saw a girl, a boy and a woman screaming and running towards Commercial avenue; that he didn't see anyone run towards the alley; that after a while the officers got in the Essex coach and drove to the hospital with Killion; that he arrived at the hospital about 12:10 A. M.; that he was present when Killion made a statement and it was reduced to writing; that in his judgment Killion and witness had been at the hospital about ten minutes before Killion signed his name to the paper; that about one-half minute elapsed between the first and second shots and one and one-half minutes between the second and third shots.

Cyral Gagne, called as a witness in behalf of the State, testified that she was at the home of Dascola about eleven P. M. on the evening in question, with a friend; that they were sitting in the kitchen and the phone rang in the dining room, and Mrs. Dascola answered the call and spoke in Italian, which language witness did not understand; that

Mrs. Dascola left the house with her apron on and walked east to One Hundred and Seventh street and got a north-bound car, which would pass Ninety-fifth street and Commercial avenue; that witness did not see Mrs. Dascola have anything in her hands when she left; that she appeared excited; that witness did not see her have a revolver on her person.

John W. Miller, called as a witness for the State, testified that on August 9, 1925, between eleven and twelve o'clock, he was driving north on Commercial avenue with his wife and family; that he slowed down at Ninety-fifth street, and as he did so saw two flashes and heard two shots of a gun from the west; that he stopped south of Ninety-fifth street; that the flashes appeared to come from a car parked alongside of a building about twenty-five feet from Commercial avenue; that witness went by Ninety-fifth street and then jumped out and ran across the street; that just as he got to the curb officer Dailey came out between the gangway and grabbed John Dascola, and Dascola pulled Dailey to the curb; that Dascola dropped something; that Dailey's gun went off as he held Dascola; that Dailey ordered the restaurant man to call the wagon; that witness went around the corner to see who was shot in the car and noticed it was Robert Killion; that he came back looking for something where Dailey had the man and found a gun, which is the gun in evidence; that he smelled of it to see if it was freshly fired, and it was.

Stanley Plucinski, a police officer, testified to seeing Killion sign a statement shortly after 12:00 o'clock and another one about 3:30 the same morning.

Daniel Killion, a brother of deceased, called as a witness on behalf of the State, testified that he had been a police officer for three and one-half years; that he saw his brother at 12:15 A. M. August 10 in the South Chicago Community Hospital and remained with him until 8:25 the next morning, when he died; that he saw his brother sign

two statements; that at the time the first statement was made there were present beside the witness two doctors, two internes, some nurses, a man by the name of Pappas, quite a few police officers and John Dascola; that at the time the second statement was made, beside the witness there were present three brothers, a brother-in-law, two sisters, two doctors, two internes, two nurses, Lieutenant Mc-Veigh and Dascola; that at the time his brother signed the second statement he was conscious but very weak.

The two statements were introduced in evidence, the first of which is:

"*August 10, 1925, 12:20 A. M.*

"I, Robert Killion, believing I am about to die, and that there is no possible chance for me to live, do hereby make the statement that I was shot by John Dascola, whom I now identify. I was bringing John Dascola's daughter home from her work when we met him and he shot me. This happened at Ninety-fifth and Commercial avenue.        ROBERT KILLION.

"Witnesses: Dr. M. E. Finsky, Sergeant Ed. McVeigh, Patrolman Jos. Schrepferman, James Dailey, Terrence McFarland, James Walsh, Stanley Plucinski."

The second statement is as follows:

"*August 10, 1925, 3:10 A. M.*

"Statement made in South Chicago Hospital.

"I, Robert Killion, believing that I am about to die, and have been so advised by Dr. Finsky, of the South Chicago Hospital, do make this statement about the manner in which I came to my injuries. I met Minnie Dascola at the Hyde Park telephone exchange, Sixty-first and Kenwood ave., where I went to meet my girl, who was not working, and took Minnie in my car to Ninety-fifth and Stony Island ave., [correction by Robert Killion,—Ninety-fifth and Commercial ave.,] where her father came up to me and wanted to know what I was doing with his daughter. A little later a policeman came along, and later a woman, who grabbed me by the hair, and while she held my hair Minnie's father shot me. I never saw him before in my life and never had any trouble with him. I was only out in company with Minnie once before, and that was in company with my girl and Minnie's fellow, named Fred. I have never had any improper relations with Minnie Dascola.        ROBERT KILLION.

"Witnesses: Lieutenant W. P. O'Brien, Sergeant Ed. McVeigh, Patrolman Jos. Schrepferman, Stanley Plucinski."

Dr. Springer, the coroner's physician, testified that he examined the body of deceased and on inspection found a bullet wound below the armpit, "on the rear end near the left side of the chest;" that he found a second bullet wound about two and one-half inches below the left nipple and an inch to the right, on the left side of the abdomen, in front; that on opening the body he found "the bullet, which entered the rear end, passed out and lodged under the skin, below the right nipple;" that the bullet which entered the front passed over to the right through the bowel, striking the seventh rib, passed through the chest and right lung and lodged in the muscles of the right armpit; that his death was caused by shock and internal hemorrhage, due to bullet wounds from .32-caliber bullets.

The above was all the material competent testimony offered by the State.

At the request of the State, and over the objection of plaintiff in error, Minnie Dascola was called as a court witness and examined by the court, not only as to what took place at the time of the shooting but in detail as to all that transpired between them from the time they left her place of work until their arrival at the place of the shooting. As to what took place at Ninety-fifth and Commercial avenue, she testified that her father came up to them and said to the deceased, "What is the matter of you, keep my girl so late?" that the deceased said, "Well, I just took her home;" that her father said to her, "Why are you so late?" and she said, "We had a flat tire;" that her father went around the car and looked at it and said, "You never had no flat tire;" that her father then gave her brother a nickel and told him to call his mother and tell her to take Minnie home, because he did not want any trouble; that her brother went in the store; that her father went to the police officer, Dailey, at the corner and said, "I want to have that fellow arrested;" that Dailey said, "Why?" and her father said, "Well, he kept my daughter up so late;" that

322—31

Dailey went to the deceased and said, "What are you do-ing here?" and he said, "I am just taking this girl home;" that her father said, "Well, I call up my wife and tell her to come and take Minnie home and I will see to it;" that he went to call up and tell her mother to meet her there; that all of a sudden she saw her mother running toward them; that her mother said, "Who hurt you, Minnie?" that she said, "I will tell you the truth but don't tell father; I will tell you when we get home;" that her mother said, "Where is the fellow?" and she said, "In the car;" that her mother went to him and said, "You animal! I will have you arrested right now!" that he pushed her face away and her mother grabbed him by the hair, and the door was open and they were struggling and her mother was scream-ing, and her father came towards them and called for the police officer; that she turned her face away, she was so scared, and she heard some shots fired; that when her father reached the automobile there was a struggle; that her mother had the deceased by the hair; that his left hand was down and with the other he had hold of her mother; that she then saw that he had a gun in his right hand; that she turned her face away before the first shot. On cross-examination by the assistant State's attorney the foundation was laid for her impeachment by asking her with reference to statements which it was claimed she made to the police while she was in their custody at the police sta-tion at three o'clock in the morning.

John Dascola testified that he left home about eleven o'clock with his son, Tony, and went to the place in ques-tion, where he saw his daughter and a man with her, and that the colloquy ensued as related by Minnie; that his wife came and went to the machine; that he heard his wife call "Help!" in Italian, and saw that she had her head in the door of the machine, pulling Killion's hair; that Killion with his left hand was holding Mrs. Dascola's right arm and in his right hand he had a revolver, which he was

pointing at her; that Dascola called the police; that at the same time he called the police he shot the gun which Killion had in his hand; that the second shot followed the first quick; that he threw the gun right away in the alley; that the first time he saw the gun was when Killion was pointing it at his wife; that he never saw Killion before the occasion in question.

Tony Dascola corroborated his father as to what took place prior to the arrival of his mother; that when his mother came she asked, "Where is Minnie?" and that he said, "Oh! bad man!" that he pointed out to his mother where his sister was; that his mother went to his sister first and spoke to her but that he could not hear what was said; that his mother went to the machine; that he could see that his mother and Killion were "scrapping" with their hands; that he then saw his father run up to the machine near the door where his mother was engaged with Killion; that he then heard two or three shots but don't know who fired them; that his mother did not have a gun when she got off the street car and that from the time she arrived she was not near his father.

Carmela Dascola testified as to the receipt of a telephone call from her husband on the night of the shooting and in response thereto going to the corner of Ninety-fifth street and Commercial avenue and inquiring of Tony where Minnie was and being directed to the machine; that Tony said, "There is a bad man;" that she went to her daughter and had a talk with her; that she asked Minnie, "What did he do to you?" and she said, "He hurt me;" that she went near the machine and said, "You animal beast! What did you do to my child?" that he said, "Go home and wash the dishes," and pushed her; that she grabbed him and he grabbed her, and in his hand he had a revolver; that she screamed; that he pushed her in the back and then she heard two shots; that she did not see her husband there; that the deceased was stooping over and with one hand

had hold of her and had the revolver in his other hand while she had hold of his hair; that she did not have a revolver at any time that evening.

In rebuttal the State called Lieutenant O'Brien, who testified, in response to impeaching questions, to statements of Minnie Dascola contradictory to her statements upon the trial, both with reference to what took place at the time of the shooting and to the details of the occurrences between herself and the deceased from the time of her leaving work until their arrival at Ninety-fifth and Commercial avenue.

It is to be noted that while the revolver with which the shooting was done was in the possession of the police from the time of the shooting until the trial no evidence was introduced as to the identity of its owner, nor was there any evidence offered tending to show that it belonged to either of the Dascolas, or that either of them ever had a revolver prior to the time in question. Neither was there any evidence offered tending to show that the revolver was not Killion's, as claimed by the Dascolas. The scene of the shooting, on a busy corner, with a policeman and priest known to be within fifty feet, is not such as usually is selected by a murderer. Under the evidence in this case it was a close question for the jury to determine whether plaintiff in error was guilty of murder or manslaughter or whether the shooting was done in the reasonable defense of his wife. It was therefore necessary that great care should be exercised by the court in its rulings upon the admission of evidence and the giving and refusing of instructions.

The only substantive evidence differing from that of the Dascolas as to the actual facts in controversy is that contained in the second statement alleged to have been made by Killion at 3:10 A. M. Plaintiff in error contends that this second statement is spurious and that the signature of the deceased is a forgery; that the same was prepared by some friend or relative of the deceased with the knowledge of police officers who testified for the State, and that by rea-

son thereof a fraud was not only perpetrated upon the trial judge and the jury but upon the State's attorney as well. In support of this contention, upon the motion for a new trial plaintiff in error produced the affidavit of Dr. M. E. Finsky, to the effect that he was constantly in the presence of Killion from shortly after his being brought to the hospital, giving him such aid as was possible under the circumstances, until between 4:30 and 5:00 o'clock in the morning; that Killion was removed to the operating room a little before 3:00 o'clock in the morning, in a semi-conscious condition; that in the operating room only those were present who were assisting in the care of the patient; that the patient lapsed into unconsciousness and was put under an anæsthetic and every effort made to save his life, but his condition was such that he never regained consciousness and died about 8:20 A. M.; that about 12:20 A. M. a statement was signed by Killion in witness' presence and in the presence of a number of police officers, and that Killion signed no other statement. Upon the motion for a new trial there was also filed the affidavit of one of the attorneys for plaintiff in error, to the effect that at the time of the hearing of the testimony concerning the taking of the statements the original statements were not present; that the assistant State's attorney in charge of the prosecution stated that he would produce them later, and that affiant, relying upon the statement, stated that he would not require the production of the originals immediately and that in order to save time copies might be used; that some time later, in the hearing of evidence on other matters, the assistant State's attorney produced what were claimed to be the original statements, but that affiant did not examine the same carefully, having no knowledge of the facts as stated by Dr. Finsky and nothing having occurred which might suggest an inquiry into the circumstances surrounding the taking of the statements, further than the testimony of the witnesses present at the trial; that during the arguments

of counsel to the jury affiant had an opportunity to examine the statements for the first time and for the first time noticed something suspicious with reference to the same, but as the court was conducting a night session in order to complete the case before the end of the week he did not then make any objections. The attorneys representing the plaintiff in error were not novices, but as shown by our records had participated in the trial of many criminal cases and knew the importance of evidence of this kind. They were not only put upon notice of the spurious character of this alleged dying declaration by the appearance of the declaration itself but by testimony in the case coming from both sides, which showed that at the time the second statement was claimed to have been made some of the witnesses whose names appeared thereon were at the police station engaged in an attempt to procure confessions from the Dascolas. Under these circumstances it must be held that due diligence was not shown, and that plaintiff in error was not entitled to a new trial on the ground of the newly discovered evidence of Dr. Finsky.

It is contended by plaintiff in error that the court erred in calling Minnie Dascola as a court witness, and also in allowing her to be impeached as to irrelevant matters, thereby confusing the issue before the jury. The State produced no witness who was able to give the exact situation of the parties at the time of the shooting or who could identify the particular person who did the shooting. Minnie Dascola was an eye-witness to the shooting. She was the daughter of the two defendants upon trial and therefore presumably hostile to the State. Where the State's attorney knows that a witness was present at the scene of a killing, but for some reason, either because he has no confidence in the witness or for some other good reason, he may doubt the veracity or integrity of the witness, he is not obliged to call such witness but the court may call him and leave him open for cross-examination by either side.

(*People* v. *Cardinelli,* 297 Ill. 116.) While the trial judge ought to exercise his right to call and examine a witness with great care and ought not to adopt the practice except where it is shown that otherwise there may be a miscarriage of justice, (*People* v. *Bernstein,* 250 Ill. 63,) in the present case the court was justified in calling the witness, but he should have limited his examination of the witness strictly to the occurrences at the time of the shooting, and have confined the cross-examination and the questions asked for the purpose of laying a foundation for impeaching the witness, strictly to matters which were material to the issue. It is a well established rule of law that a witness cannot be impeached upon an immaterial statement or cross-examined as to immaterial or irrelevant matters. (*People* v. *Decker,* 310 Ill. 234; *People* v. *Israel,* 269 id. 284.) It was immaterial whether or not Minnie Dascola actually had sexual intercourse with deceased on the night in question prior to their arrival at Ninety-fifth street and Commercial avenue, and the court erred in allowing her to be questioned upon that subject on cross-examination and impeached by showing that she had made statements on that subject at variance with her testimony on the trial.

At the request of the State's attorney the court gave to the jury an instruction in the language of the statute defining murder, express malice and implied malice, without defining what constituted the unlawful killing of a human being and ignoring plaintiff in error's defense that the shooting was done in the necessary defense of his wife. From this instruction the jury might well be misled into believing that if plaintiff in error deliberately shot the deceased, and death resulted, he was guilty of murder even though he in good faith believed, on apparently reasonable grounds, that his wife was in danger of losing her life or of receiving great bodily harm at the hands of the deceased and there appeared to plaintiff in error no other means of avoiding the danger. This instruction is not exactly like

the one criticised in *People* v. *Spranger*, 314 Ill. 602, but it is an abstract proposition of law liable to be misleading, and should not have been given without calling attention to plaintiff in error's defense.

Plaintiff in error requested the court to instruct the jury that one of the methods provided by the law for impeaching a witness is the proof of statements which are different from those made upon the stand; that these are offered only to affect, if possible, the credibility of the witness, and that no statements made out of the presence of the defendants are in any way binding upon them. In rebuttal the lieutenant of police testified to statements of Minnie Dascola which were different from those which she made upon the stand with reference to the situation of the parties at the time of the shooting and to the effect that deceased did not have a gun. Testimony of statements made by a witness inconsistent with the testimony given by such witness upon the trial is admissible only for the purpose of impeaching the credit of the witness and cannot be received as evidence of any fact touching the issue to be tried, for that would be to substitute the statements of a witness when not on oath as evidence between the parties for his evidence given under the sanction of an oath upon the trial. (*Purdy* v. *People*, 140 Ill. 46; *Ritter* v. *People*, 130 id. 255; *Moore* v. *People*, 108 id. 484.) In *Gould* v. *Norfolk Lead Co.* 9 Cush. 346, it is said upon this subject: "It is no evidence whatever that the facts are as he formerly stated them, and though appeals are sometimes made to a jury that it is so, it is the province of the court to inform them that it is not so." While the instruction in this case is somewhat inartificially drawn, we think its meaning is clear and the jury could not have been misled by it.

This is a close case upon the facts, and for the errors indicated the judgment must be reversed and the cause remanded to the criminal court of Cook county.

*Reversed and remanded.*