THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT J. THOMAS, Defendant-Appellant.

First District (1st Division)   No. 78-226

Opinion filed April 30, 1979.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Diane Michael Powell, Assistant State's Attorneys, of counsel), for the People.

\* Mr. JUSTICE BUCKLEY delivered the opinion of the court:

Defendant, Robert Thomas, was charged by information with rape, deviate sexual assault, and armed robbery. After a jury trial, he was

---

\* This opinion was prepared by Justice Buckley while assigned to the Illinois Appellate Court, First District.

convicted on all three charges. The circuit court of Cook County subsequently sentenced defendant to serve concurrent terms of 20 to 40 years in the Illinois Department of Corrections for each conviction.

Defendant appeals from his conviction contending: (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred by restricting defendant from showing that a police officer made a prior inconsistent statement at the preliminary hearing; (3) the court erred in allowing certain hearsay testimony; (4) the court erred by refusing to delete the word "sex" from the cover of a "mugbook" which contained defendant's picture; and, (5) the trial court erred in refusing to allow testimony of an officer's usual police procedure in displaying "mugbooks" to crime victims.

Pertinent facts as developed in the lower court follow:

Defendant made a pretrial motion to suppress the identification testimony of complainant. Defendant theorized that there were numerous discrepancies and uncertainties in her identification testimony and that identification procedures implemented by the Chicago Police Department were unduly suggestive. The trial court denied the motion to suppress finding a lack of suggestivity in the procedures implemented and a consistent pattern of identification by complainant.

We need not recite the testimony elicited at this hearing, since, on appeal, defendant does not contest the propriety of the court's ruling on the motion, but rather contends that the trial record establishes a reasonable doubt of identification.

At trial, complainant testified that at approximately 4 p.m. on December 28, 1976, she left work, arriving home sometime after 4:15 p.m. She entered the courtyard of her apartment building, proceeded to her mailbox in the vestibule and was then confronted by a man she identified in court as the defendant. Defendant told her not to scream and that he had a knife. The victim testified that he held a folding knife with a black handle. She identified a State's exhibit as a knife that is or is like the one her attacker used. Complainant asked the defendant if he wanted money and he replied affirmatively. Initially, she could not find any money in her purse. At that point the defendant told her: "Let's walk out; I don't want anybody to see me here."

Defendant then forced his victim at knifepoint to accompany him through a gangway to the rear of the building. Complainant testified that lighting conditions were good from the vestibule to the courtyard of the building which leads to a gangway to the rear of the building. The source of the lighting was street lights.

Complainant further testified that at the rear of the building, they arrived at a "shack-like" garage with two missing walls. Upon entering the garage, her assailant told complainant to put her purse down and remove

her coat. She put her purse down, gave him approximately nine dollars, but refused to take her coat off because it was too cold. At this point, defendant exposed his penis. When a dog barked he put his penis back in his pants and ordered his victim to accompany him.

Assailant and victim proceeded down an alley to the street and then re-entered the alley. While they were walking near the street, defendant ordered complainant to put her arm around him so that any people passing would think they were together by choice. During the entire time they were walking, defendant kept his knife next to complainant's side. They reached another gangway which led to a basement, located under the porch of the building.

We believe that it is necessary to recount in detail the gruesome nature of the attack on complainant because identification of defendant is at issue upon appeal. The following testimony by the complainant evidences her opportunity to view her assailant in close proximity for a long duration.

Upon reaching the bottom of the stairs, assailant ordered complainant to her knees and forced her to perform fellatio. He then forced her to lie down, remove her panties, and have intercourse with him. Immediately thereafter, she was directed to "clean up" his penis and forced to perform another act of oral copulation. Finally, assailant once more forced his penis in complainant's mouth and this time urinated. Complainant testified that the entire ordeal took about one hour.

When defendant left, complainant dressed, retrieved her purse, and called the police. The police arrived shortly and transported her to Saint Anne's Hospital where she was treated.

Complainant further testified that while she was at the hospital she was interviewed by the police officers. She described her attacker as five feet five or six inches tall, weighing between 140 and 160 pounds. He had a stocky build, medium dark complexion, and was unshaven. She also testified that her attacker was wearing a knit wool skull cap.

On December 28, 1976, two days after she was attacked, complainant went to Area 4 Homicide/Sex police headquarters to view pictures of possible suspects. Complainant testified that she viewed six to eight books captioned "sex" or "robbery" and selected three photos of men who resembled the rapist. She did not see any photographs of defendant in the photobooks viewed.

Complainant further testified that on January 8, 1977, Officer Dulay and his partner arrived at her home and showed her five photographs. She recognized one of the five as her assailant. That photograph was of defendant. At about 7 p.m. on the same day at police headquarters, the victim witnessed a lineup comprised of five individuals. During the lineup, she requested that the men say "shut up bitch," a phrase used by

her attacker. Complainant then positively identified defendant as her attacker.

On cross-examination, complainant testified that the mugbooks she viewed on December 30, 1976, were similar to defendant's exhibit one, an Illinois Department of Corrections photograph book of sex offenders who were recent parolees (penitentiary releasee book). Additionally, she stated that of the five pictures displayed by Officer Dulay, only defendant's picture was stocky. She maintained that she was positive defendant was her assailant before he spoke at the lineup.

On redirect examination, complainant explained that she knew she had not viewed defendant's exhibit one on December 30, 1976, because none of the books she saw contained defendant's picture. She also testified that, as she was leaving the lineup on January 8, 1977, she was shown a knife. In her opinion, it was the same knife she identified in court. Finally, when again asked to explain the difference between defendant's exhibit one and the photo books she viewed, complainant testified that the images in the defendant's exhibit were larger.

Investigator Charles Dulay next testified for the State. He corroborated complainant's account of what transpired after the police arrived, including her interview at St. Anne's Hospital. When Dulay was asked to describe defendant's exhibit one, the defense objected. At sidebar, the State argued that the penitentiary releasee book need be distinguished from other mugbooks in order for the jury to comprehend and believe complainant's differentiation on the basis of image size. Defendant's offer to stipulate as to the difference in image size was refused by the State and defendant's objection overruled by the trial court. Dulay then testified that the images in defendant's exhibit were larger because their origin was the Illinois Department of Corrections. The other mugbooks contained photos taken by the Chicago Police Department.

Dulay also testified concerning complainant's photo identification of January 8, 1977. He explained that complainant thought the picture of defendant depicted her attacker, but she wanted to see him in person to be positive. He noted her identification as tentative in his report.

On cross-examination, Dulay testified that he remembered complainant's description of her attacker's complexion as "dark brown." Dulay did not know which officer had shown complainant the photobooks on December 30, 1976.

The State's final witness was Officer Michael Cronin. He testified that he participated in the arrest of defendant on January 8, 1977. The witness and his partner searched defendant pursuant to arrest and discovered a knife. In his arrest report Cronin listed defendant's height as five feet seven inches and his weight as 180 pounds. Cronin was provided these

statistics by defendant. Cronin helped conduct the lineup during which complainant identified defendant. When asked what complainant did when she saw the knife at the lineup, Cronin testified that she jumped back and said "That's the knife."

Prior to the defense's case, the State made a motion *in limine* to prevent Sergeant Keating from testifying as to police procedure for showing rape victims the penitentiary releasee photobook. The court ruled that the motion would be granted since Officer Miskulin, who was the desk officer on December 30, 1978, would testify.

Defendant's theory of the case was twofold. He presented alibi witnesses and attempted to impeach complainant's identification testimony via: evidence of discrepancies and the inference that she had viewed defendant's exhibit one yet failed to recognize his picture.

Sergeant Robert Keating testified first for the defense. He stated that he had been assigned to Area 4 Homicide/Sex of the Chicago Police Department since April of 1976. Keating stated he was familiar with photograph books stored at that location and shown to crime victims. He identified defendant's exhibit one as a photo book kept at the Area 4 station. Keating further testified that the photograph image size was generally the same. The image size of the pictures in defendant's exhibit one, also, was approximately the same as in the other police mugbooks.

On cross-examination, Keating stated that the penitentiary mugbook did not contain any color photographs but that other police photo books contained about 90% color photos. He agreed that the few black-and-white photos in the other police books were smaller than the pictures in defendant's exhibit one. The photos in defendant's exhibit appeared to have been taken from a closer camera position. Over defendant's objection, Keating also testified that the source of the photos in defendant's exhibit one was the Illinois Department of Corrections.

Officer Nick Lebris testified that he and his partner, Officer Forte, interviewed complainant at about 6:20 p.m. on the night of the rape. Complainant described the rapist by answering Lebris' questions. When asked "[i]s he 5 feet 2 inches, 5 feet 4 inches or 5 feet 6 inches" and whether he is "about 130, 140, 150 pounds," she merely responded "yes." Complainant also told Lebris that her assailant's eyes were brown, his hair was dark and his complexion was medium to medium dark.

On cross-examination, Lebris testified that he interviewed the victim soon after the attack and she was "very very shaken; very distraught." She could not give immediate, direct responses to the officer's questions. Complainant also described her assailant as unshaven.

Susan Coleman, a student and part-time clerk for the public defender office, next testified concerning a telephone conversation she had with complainant on March 24, 1977. Coleman telephoned complainant

regarding her pretrial identifications of defendant. According to Coleman, complainant said that she had looked through six to eight photo books at the police station on December 30, 1976. She selected three or four pictures of men who looked similar to the assailant. Complainant also told Coleman that the photo she chose from the five displayed by Investigator Dulay also looked similar to the rapist. Furthermore, she recounted that when she selected defendant at the lineup she was not positive until after he spoke. She eliminated the other men from consideration because they were "too fat or too skinny."

On cross-examination, Coleman testified that she could not recall the exact words complainant used despite having written questions in advance and writing down complainant's answers.

The next three witnesses for defendant, Rudolph Johnson, Harold Jackson, and Rita Jackson, testified with regard to defendant's alibi. Rudolph Johnson is the father of Rita Jackson and the father-in-law of Harold Jackson and all three are friends of defendant. Rudolph Johnson testified that his daughter, Rita Jackson married Harold Jackson on December 18, 1976. He identified two defense exhibits. The first was a picture taken at his daughter's wedding which depicted defendant. The second exhibit was a photograph of another wedding taken on December 25, 1976, which also included defendant. Both photographs showed defendant had a beard and mustache.

Johnson also testified as to defendant's continual presence in Johnson's home on December 28, 1976, during the time complainant was raped. On that date Johnson arrived home at about 3:30 p.m. and found defendant and various other people present. Defendant and Johnson watched television in Johnson's bedroom from between 4:30 p.m. and 5 p.m. until 7 p.m. Johnson testified that at 7 p.m. defendant accompanied Rita Jackson outside to meet Harold Jackson.

On cross-examination, Johnson asserted that neither he nor defendant left his bedroom from 4:30 p.m. to 7 p.m. Johnson was also cross-examined on why he did not tell the police defendant had been in his presence at the time of the rape. He replied that he did not think it would do any good as he would only be told to "tell it to the judge."

Harold Jackson testified corroborating some aspects of Johnson's testimony including the fact that defendant had a beard and mustache. No corroboration of the alibi was achieved, however, since on cross-examination, Jackson admitted that he had not been with defendant from 4:30 p.m. to 7 p.m. on the night of the rape.

Rita Jackson testified that defendant had a mustache and a beard on December 28, 1976, and at both weddings. She stated that between 4:30 and 5:30 p.m. she was getting ready to go out to dinner with her husband. During that time she entered her father's bedroom about four or five

times. She saw defendant on those occasions and also at about 6:45 p.m. when her husband came to pick her up. On recross-examination she testified that her father's home was about 2½ blocks from the site of the rape.

Birdisteen Evans next testified for the defense. She was defendant's girlfriend and had known him since May, 1976. She testified that on December 24 and 30, 1976, defendant had a mustache and beard.

Investigator Michael Miskulin of the Chicago Police Department was the final witness. He testified that he was on duty as the desk officer at Area 4 Homicide/Sex headquarters on December 30, 1976, but recalled complainant only faintly. Miskulin could not remember whether he had shown the penitentiary release mugbook to complainant nor could he recall whether she picked out photos from the mugbooks.

Miskulin further testified that if he showed photo books to victims, he would generally select books relating to the category of crime(s) committed. Usually the victim would be told to mark the photographs similar to the offender and Miskulin would leave a note to inform the investigator assigned to the case. He had no recollection, however, of what procedure was used in this case or whether he informed Dulay concerning complainant's selections.

In conference out of the presence of the jury, the defense again moved to call Officer Keating and made an offer of proof as to his testimony. Counsel for defendant contended that Miskulin was an uncooperative witness and that Keating's testimony would be probative as to which photo books Williams viewed. If called to the stand it was asserted that Keating would testify, that based on his years of experience, he would first show victims the penitentiary releasee book. The trial court denied defendant's motion.

The jury returned a verdict finding defendant guilty of rape, deviate sexual assault, and armed robbery. Post-trial motions were denied, judgments were entered on the verdicts and defendant was sentenced. Defendant appeals his convictions.

Defendant contends that he was not proved guilty beyond a reasonable doubt because complainant was uncertain in her pretrial identifications of defendant and because defense testimony established an alibi and discrepancies in identification. Specifically, defendant points to identification discrepancies concerning height, weight, shade of complexion and whether the assailant was unshaven or had a mustache and beard.

■■ We find that the record clearly demonstrates that complainant had ample opportunity to observe her assailant under such circumstances as would permit subsequent recognition. The test of a positive identification is whether the witness was close enough to the accused for a sufficient

length of time under conditions adequate for observation. (*People v. Brown* (1977), 50 Ill. App. 3d 348, 365 N.E.2d 907; *People v. Jenkins* (1975), 31 Ill. App. 3d 910, 335 N.E.2d 87.) Where this test is met, the credible testimony of one witness is sufficient to support a finding of guilt. (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Tripp* (1974), 19 Ill. App. 3d 200, 311 N.E.2d 168.) Minor discrepancies or omissions in description testimony do not necessarily affect the validity of the identification of the accused; rather they affect the weight to be given the testimony. *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

■■ As applied to this case, there is no reasonable doubt as to the guilt of defendant since complainant had ample opportunity to observe her assailant over a long period of time and under sufficient lighting. Defendant spent between 30 minutes and one hour with his victim in various locations which were well lit according to complainant. The nature of defendant's sexual attacks, which included an act of sexual intercourse and twice forcing her to perform fellatio, clearly establish the requisite proximity to serve as a sufficient basis for subsequent positive identification.

In addition to her positive identification of defendant as her assailant at trial, complainant had made two pretrial identifications. First, complainant chose defendant's photo from five pictures Investigator Dulay showed her. Second, she picked defendant as her assailant from a police lineup. Moreover, complainant was not confused by the hundreds of photographs she viewed in several mugbooks. She realized that although some of the individuals resembled her assailant, none of them was the assailant. Complainant steadfastly maintained that she did not view the penitentiary releasee mugbook at Area 4 headquarters because it contained defendant's picture and she did not see his picture at that time.

Against this convincing evidence, defendant has failed, in our opinion, to offer probative evidence that the victim viewed the penitentiary mugbook.

Moreover, even if complainant did request to see defendant in person after viewing his photo and did not make a positive identification until after the men in the lineup spoke, her hesitancy does not establish a reasonable doubt of guilt.

■■ ■ Rather than disapprove such precautionary measures, courts explicitly sanction care in identification. (*People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462.) Although complainant's earlier identifications may be considered tentative in nature, there were no inconsistent identifications. At best there were some discrepancies in her description of her assailant (*i.e.*, concerning height, weight, complexion color and whether complainant was unshaven or had a beard and mustache), which

was rendered minutes after the attack. We find these discrepancies were minor, and that at that time complainant was beset by the trauma of the ordeal. Under these circumstances discrepancies may affect the weight to be accorded her testimony (*People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229), but do not invalidate her identification.

Defendant also asserts he was not proved guilty beyond a reasonable doubt in light of alibi testimony establishing his presence away from the scene of the rape and testimony contradicting complainant's description of defendant.

Defendant attempted to impeach complainant's identification testimony through the testimony of three witnesses that he wore a beard and mustache at the time of the rape. Complainant had claimed her attacker was merely unshaven, *i.e.* having a few days growth of facial hair. Again, such discrepancies in description do not invalidate the identification, but merely effect the weight of the evidence. *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

Three defense witnesses testified that during the time span during which the rape occurred, December 30, 1976 from 5:30 p.m. to 6 p.m., defendant was elsewhere. However, only Rudolph Johnson claimed that he was with defendant over a substantial period of time: from 4:30 p.m. to 7 p.m. Harold Jackson was not with defendant during this time. Rita Jackson testified that she saw defendant four or five times between 4:30 p.m. and 5:30 p.m. and next saw him at about 6:45 p.m. Because of the proximity of the scene of the crime to the Johnson home, if Johnson's testimony were disbelieved, defendant may have left the house and reappeared without any other person noticing.

In any event, where the evidence is conflicting, it is the province of the jury to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) A court of review will not substitute its judgment for that of the trier of fact on questions of witness credibility. (*Manion.*) We will not substitute our judgment for that of the jury as to the credibility of defense witness alibi testimony and description discrepancies. Accordingly, we find no reasonable doubt of guilt has been demonstrated.

Defendant next contends that the trial court committed prejudicial error in refusing to allow Investigator Dulay to be cross-examined regarding a prior inconsistent statement made at the preliminary hearing. At trial on direct examination, Dulay testified that on January 8, 1977, complainant picked defendant's photo out of five photographs Dulay had shown her. The following colloquy concerns the strength of her identification.

"Q. And what is it that she indicated in the kitchen on the 8th of January with respect to the photograph?

A. As I recall, it was that she thought that was the man, but she wanted to see him in person in order to be positive."

Subsequently, the trial court sustained an objection to the introduction of Dulay's preliminary hearing testimony. The barred testimony follows:

"Q. Did she indicate to you in any way that the photograph of Robert Thomas looked similar to the man, but she had to see him in person to be sure?

A. Yes, Sir."

■■ Cross-examination as to prior inconsistent statements is a well-established form of impeachment. However, as a threshold consideration, the inconsistency must be substantial and relate to a material and not a collateral or irrelevant matter. (*People v. Dascola* (1926), 322 Ill. 473, 153 N.E. 710.) The test to be applied is whether the inconsistent statement has a reasonable tendency to discredit the direct testimony on a material matter. (*People v. Rainford* (1965), 58 Ill. App. 2d 312, 320-21, 208 N.E.2d 314, 318-19; McCormick, Evidence, ch. 5, §34, at 64 (1954).) Furthermore, a witness is not discredited by a slight variance between his testimony and prior statements, absent a material inconsistency or contradiction. *People v. Boyd* (1974), 22 Ill. App. 3d 1010, 318 N.E.2d 212.

■■ We find no material variance between Investigator Dulay's testimony at trial and at the preliminary hearing. Both statements refer to complainant's hesitancy to commit herself to a positive identification without seeing defendant in person. The trial court is afforded wide discretion in controlling the scope of cross-examination. (*People v. Sparkman* (1979), 68 Ill. App. 3d 865, 386 N.E.2d 346; *People v. Hayes* (1975), 32 Ill. App. 3d 953, 337 N.E.2d 280.) Dulay's testimony reasonably informed the jury that complainant's identification was tentative. Accordingly, the trial court did not abuse its discretion.

Defendant next contends that the trial court erred in permitting Officer Cronin to testify that complainant exclaimed, "That's the knife!" Complainant was referring to a knife police had shown her immediately following the lineup. The apparent basis for defendant's objection to Cronin's testimony is that the testimony is objectionable hearsay. See *People v. Harrison* (1962), 25 Ill. 2d 407, 185 N.E.2d 244.

We are of the opinion that Officer Cronin's statement is not excluded by the hearsay rule since it pertains to an excited utterance by complainant. An excited utterance has been defined as:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." (Fed. R. Evid. 803(2).)

Illinois law is in accord with the Federal rule and requires: "(1) an occurrence sufficiently startling to produce a spontaneous and

unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence." *People v. Damen* (1963), 28 Ill. 2d 464, 471, 193 N.E.2d 25, 30.

The circumstances surrounding complainant's statement convince us that the requirements of *Damen* were met. Investigator Cronin testified that at the lineup, subsequent to complainant's identification of defendant, she noticed the knife recovered from defendant, jumped and exclaimed, "That's the knife." In our view, complainant was sufficiently startled and excited by what she believed to be the weapon brandished by her assailant, that the trial court may properly have admitted Cronin's testimony.

In any event, Cronin's testimony is not prejudicial since it is cumulative as to other evidence. (*People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.) During redirect examination complainant was questioned concerning a knife she had been shown after the lineup. Although she did not testify as to her exact words upon being shown the knife, she did testify that the knife displayed at the lineup was the knife she subsequently identified in court as being the knife or similar to the knife used by her attacker.

■■ Furthermore, identification of the knife was not essential to prove defendant's guilt. The knife was secondary evidence found on the accused and merely served to strengthen a positive identification by the victim. Where the record establishes sufficient, competent evidence to establish the guilt of defendant beyond a reasonable doubt, error in the admission of evidence will not warrant reversal absent prejudice to the defendant. (*People v. Pelkola* (1960), 19 Ill. 2d 156, 166 N.E.2d 54.) The statement complained of does not serve as a substitute for courtroom identification nor is it used to strengthen or corroborate a weak identification. See *People v. Daliege* (1976), 40 Ill. App. 3d 706, 352 N.E.2d 247.

Defendant's next assertion of error concerns the trial court's refusal to delete the word "sex" from the cover of the penitentiary releasee book prior to sending it back to the jury. Furthermore, defendant contends that certain testimony regarding the source of defendant's exhibit was prejudicial. Finally, he argues that the trial court should have given a forceful, limiting instruction that defendant's exhibit was solely admitted into evidence for purposes of identification.

■■ Turning first to the alleged error in failing to grant a limiting instruction, we note that defendant never asked for this limitation at trial, did not tender such an instruction, and failed to include this issue in his motion for a new trial. Accordingly, this issue is waived upon appeal. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

The State also contends that the issues regarding refusal to delete the

word "sex" and alleged prejudicial testimony as to the source of the exhibit are also waived for failure to preserve these issues in defendant's written motion for a new trial.

■■ We note that defendant objected to both these practices at trial and received adverse rulings. The waiver principle is not an ironclad rule. (*People v. Norris* (1972), 8 Ill. App. 3d 931, 291 N.E.2d 184.) One exception, stated in *People v. Dees* (1977), 46 Ill. App. 3d 1010, 1018, 361 N.E.2d 1126, 1131, is applicable here.

"[W]here an issue not specified in the motion for a new trial had in fact been brought to the attention of and ruled upon by the trial court and where the accused would have been prejudiced should his contention be established as well-founded [the waiver rule may be relaxed]."

■■ Accordingly, we choose to address these issues since improperly admitted evidence of prior sex offense convictions could be prejudicial to defendant. However, we find that under the circumstances of this case defendant's right to a fair trial was not prejudiced.

Defendant moved that the word "sex" be deleted from the penitentiary releasee book before it was tendered to the jury. At trial, there was repeated testimony regarding defendant's exhibit one and other mugbooks. Complainant described the mugbooks she witnessed as bearing either the word "sex" or "robbery." Keating testified that defendant's exhibit was one of seven "sex" books at Area 4. Miskulin stated that the books shown victims were labeled according to the crime committed including "sex" books. Testimony was also elicited that all mugbooks in issue, including defendant's exhibit were kept at Area 4 Homicide/Sex headquarters.

■■ Because of these repeated allusions to the labels on the mugbooks and to this exhibit in particular, the trial court concluded that to send a mugbook to the jury without the label "sex" would contradict the testimony elicited. Questions concerning the manner and extent of presentation of evidence are largely within the discretion of the trial court. (*People v. Jenko* (1951), 410 Ill. 478, 102 N.E.2d 783.) We find no abuse of discretion in the trial court's actions and no prejudice to defendant in allowing the jury to see the exhibit with the label "sex" as it had been repeatedly referred to and identified.

A more troubling issue centers around the fact that at trial the State was permitted to elicit testimony that the defense exhibit mugbook was prepared by the Illinois Department of Corrections and forwarded to the Chicago Police Department. This testimony was elicited for the reason that the jury might not believe complainant's testimony that the image size in the penitentiary book was different from that of other mugbooks.

Defendant, however, offered to stipulate that the image sizes were smaller in the other book. The State refused this stipulation.

We are of the opinion that no prejudial error resulted since evidence of prior criminality was inferential rather than direct, all matters pertaining to "sex" mugbook identification were initiated by defendant, and because of trial strategies employed by defendant, the jury was unavoidably appraised that defendant's picture appeared in a "sex" mugbook.

The reception or exclusion of evidence is within the province of the trial court, and a reviewing court will not interfere absent an abuse of discretion prejudicial to defendant. (*People v. Jenko* (1951), 410 Ill. 478, 102 N.E.2d 783.) We note that Officer Dulay testified for the State concerning a variance in image size between the pictures in defendant's exhibit one and the other mugbooks at Area 4 headquarters. Officer Keating, a defense witness, initially denied any variance. On cross-examination, however, he agreed that the few black and white photos in other mugbooks were smaller and appeared to have been taken from a closer camera position than the photos in defendant's exhibit one. Therefore, testimony that the source of defendant's exhibit one was the Department of Corrections, whereas the other mugbooks were compiled by the Chicago Police Department, served to corroborate Dulay's testimony and Keating's statements on cross-examination. It provided the jury with a rationale for both understanding and believing the State's contention that complainant did not view defendant's exhibit one at the station. With this probative value of Keating's testimony in mind, we turn to defendant's allegations of prejudice.

Introduction of defendant's exhibit one and the mugbook controversy that developed was a matter of trial strategy implemented by the defense. Defendant sought to create an inference that complainant had viewed the penitentiary releasee book yet failed to identify his picture. A corollary issue developed concerning variance in image size between the books in question and the reason for that variance.

■■ Where the admission of evidence is procured, invited or acquiesced to by the defendant, even though such evidence is improper, defendant cannot complain upon appeal. (*People v. Burage* (1961), 23 Ill. 2d 280, 178 N.E.2d 389, *cert. denied* (1962), 369 U.S. 808, 7 L. Ed. 2d 555, 82 S. Ct. 651; *People v. White* (1974), 25 Ill. App. 3d 391, 323 N.E.2d 376.) During pretrial proceedings, defense counsel was admonished by the court that development of the mugbook controversy would inevitably communicate to the jury that the accused had a criminal record. Clearly, at a minimum, the jury would infer that defendant had been involved with the police regarding a sex offense and may have had a criminal record. This

conclusion resulted from testimony elicited from Officer Miskulin by the defense that exhibit one was a sex mugbook which would be shown to rape victims. Under these circumstances we cannot say that any inference of prior criminality was not attributable to defense trial strategy. Accordingly, we find defendant was not denied a fair trial.

Defendant's final contention is that the trial court erred in barring testimony by Officer Keating as to usual police procedure regarding mugbooks. Defendant wanted to impeach and contradict complainant's testimony that she had not viewed the penitentiary releasee book containing defendant's picture. Counsel for the defense made an offer of proof that if called to testify Keating would state that the penitentiary release book would be the first book he would show a victim. Defendant argues that Keating's testimony was probative of what transpired especially since Officer Miskulin had little recollection and was allegedly an uncooperative witness.

Investigator Miskulin had testified that he was on duty as the desk officer at Area 4 headquarters when complainant viewed the mugbooks. Miskulin faintly recalled having met complainant but did not remember showing her any mugbooks. When questioned concerning his procedure with regard to mugbooks, Miskulin testified that he would generally select books relating to the type of crime committed and show those books to the victim. Miskulin had no independent recollection of what procedure he implemented on December 30, 1976, or whether he showed the victim the penitentiary releasee mugbook. Additionally, no records were kept concerning what transpired.

■■ Defendant offered no evidence that a Chicago Police Department rule, regulation or uniform practice existed concerning proper procedure for displaying mugbooks to crime victims. The offer of proof as to Keating's testimony only consisted of what he would have done under the circumstances and again presents no evidence of a uniform police practice. Keating's testimony would offer little or no probative value as to what actually transpired on December 30, 1976. The two parties who were present, complainant and Miskulin, were best qualified to offer evidence on that issue. The trial court is vested with wide discretion in determining the relevance of evidence (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14), and because Keating's testimony would be of a conjectural nature, we find the trial court properly exercised its discretion and control over witnesses by barring Keating's testimony.

For all of the aforementioned reasons, we find no prejudicial error in defendant's trial and affirm the judgment of the circuit court of Cook County.

Affirmed.

McGLOON and McGILLICUDDY, JJ., concur.