THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN SANDERS *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 61737

Opinion filed May 6, 1976.

James J. Doherty, Public Defender, of Chicago (Roberta K. Cole and Richard D. Kharas, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and David Novoselsky, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

John Sanders and Clarence Davis, defendants, were indicted for the offense of rape in violation of section 11—1 of the Criminal Code (Ill.

Rev. Stat. 1971, ch. 38, par. 11—1) and the offense of robbery in violation of section 18—1 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 18—1.) After a bench trial, both defendants were found guilty of both crimes and each was sentenced to the penitentiary for a term of not less than 8 years nor more than 24 years for the crime of rape and not less than 6 years nor more than 20 years for the crime of robbery.

Defendants raise the following issues on appeal: (1) whether defendants were proven guilty beyond a reasonable doubt; and (2) whether the trial court committed reversible error when it failed to require the State to produce a statement obtained from a defense alibi witness.

We affirm.

On August 18, 1973, the rape victim and Walter S. Arnold (hereinafter Arnold) were visiting a friend of Arnold's, Bruce DeGrazia, near 55th and Kimbark, Chicago. Between 2:30 a.m. and 2:35 a.m. they left DeGrazia's home and walked north on Kimbark toward Arnold's home, which was located at 4827 South Kenwood, Chicago. About five minutes after leaving DeGrazia's, two males approached them from behind, grabbed Arnold and the rape victim around the neck and forced them into a nearby alley. Arnold was forced to lie face down on the ground on one side of a parked auto, while the victim was taken to the other side of the car. Both men raped her and took money from her and Arnold.

The victim testified that at approximately 2:30 a.m. on August 18, 1973, she and Walter Arnold were walking north toward Arnold's house, 4827 South Kenwood, Chicago. As they approached 52nd and Kimbark, someone came up behind her and grabbed her around the neck. Another man, who was black and whose hair was in braids, grabbed Arnold. She said she could not see very clearly but she could see that the man holding her was also black. At the time, the individual holding Arnold was facing the victim and she noticed he was wearing a jacket that had been cut off, with several patches on the right hand side. One of the men said they wanted money and told her that if she cared about her boyfriend she should not do anything stupid because they would kill him. At that time the man was facing the victim and was right behind Arnold. They started to cross the street and she observed the attire of the man who was holding Arnold. The pants were dark in color, cut off at the knees and fringed. The four persons went into the alley for about a half a block before they stopped in front of a white car. The lighting conditions in the alley were good. The man holding Arnold took him on one side of the car as the man holding the victim took her on the other side of the car. She said the man holding her pushed her down to the ground. At the time she noticed his pants and his belt. The belt was brown with studs on it. She said that when the individual pushed her down, his belt was level with her head.

The victim further testified that the men changed places; that the man who was wearing the belt walked in front of her to the other side of the car and the man who was holding Arnold came over to her side. He told her to remove her boots, which she did. He was standing and facing her as she was seated on the ground and told her that if she did not do what he said, he would kill Arnold. She said that at that time the assailant was approximately one foot away from her, that she observed his facial features and that he had a beard and a mustache. As he was leaning over her and she was lying on the ground, the assailant unzipped her pants and asked her if she had anything up her. She said, "Yes," that she had her period. He removed a Tampax and threw it aside. He removed her slacks, unzipped his pants and pulled them down but did not take them off. He got on top of her and at that time his head was right next to hers, it was only a few inches away. She was facing him and he was facing her. After he got on top of her, he forced his penis into her vagina. He had remained on top of her for about three to five minutes when she heard the other man say, "Come on John." She said that John, whom she identified as John Sanders, then got off of her and pulled up his pants. The other man, whom she identified as Davis, came over and Sanders passed in front of her. Davis stopped in front of her, pulled down his pants and got on top of her. His face was only a few inches from her face. He forced his penis into her vagina. She said Davis remained on top of her for a few minutes and then got off and walked around the front of the car. When he backed up she was resting on her elbow and saw him zip up his pants and buckle his belt. She said that Sanders, the man who first raped her, came over again, pulled his pants down and was standing in front of her. She was facing him and he was facing her. He got on top of her and forced his penis in her vagina. He was biting her face and started to strangle her when she said, "You are killing me." He stopped, got off of her and pulled up his pants. After Sanders got off of her the second time, he walked to the other side of the car and then Sanders and Davis left. She put her pants back on and looked for her boot, which she could not find. Arnold got up and picked up her jacket. They went to a friend's house nearby where the victim went into the bathroom to clean up because she was having her period and she "was starting to bleed all over the place." She then called the police.

The victim further testified that two police officers came over to the house and that she gave them a description of her assailants and their wearing apparel. One of the police officers went out to the alley with Arnold and returned with her boot. The police officers then took her, Arnold and Nancy LaPaglia to Billings Hospital. After the victim was examined by a doctor at the hospital who took some tests and gave her two shots, one of the police officers, Officer Young, told her there were

some men he wanted her to look at and possibly identify. As she and Nancy walked down the hallway, Sanders stood up and said, "Lady, it ain't me," at which point the victim told Sanders, "I could recognize you just by the smell of your breath alone." She commented that Sanders had smelled very strongly of alcohol at the time of the incident. The victim looked at Davis and recognized his face. She told Officer Young that she could recognize both of the men. She said that when she saw Sanders and Davis at the hospital, Sanders was dressed the same as at the time of the occurrence and that she recognized Davis' pants but did not recognize his shirt.

On cross-examination, the victim said she met Arnold about 1:30 a.m. on August 18, 1973, at a folk dance. She said that she did not have anything of an alcoholic nature to drink at DeGrazia's house. She testified that while she was being assaulted, the men took a dollar and her wallet, which she had in her jacket. She further stated that at a preliminary hearing on September 20, 1973, she said she had no money with her but that the men did take her wallet. She said that at the time of the preliminary hearing she had forgotten about the dollar; and that later Arnold reminded her that she did have a dollar.

Walter Arnold substantially corroborated the testimony of the victim. He said the men took $9 of his money and that he was present when the victim gave the police officers a description of the assailants. He said she gave most of the description. Arnold stated that he commented when he disagreed; that he disagreed with her mostly about her clothing descriptions; and that the victim gave the police a description concerning the height and weight and hair style. She said the person who grabbed Arnold originally had a slight beard and a mustache and that his hair was in braids. Arnold identified Clarence Davis, one of the defendants, who was wearing a tan shirt, brown pants and light jacket; and stated that he was the man who had been holding the victim. Arnold further testified that it was a clear bright night and there were streetlights in the alley; that there was a light approximately 50 to 100 feet away to Arnold's left; and that there was another light about the same distance away and to his right.

On cross-examination, Arnold stated that he did not disagree with the victim's description as to the height and weight of the men, but disagreed with her statement that Davis was wearing a red T-shirt. He said they also agreed about the pants worn by Sanders. On further cross-examination, Arnold said he had known the victim prior to August 18, 1973, and that the first time he saw her that evening was around 10 p.m. at the University of Chicago, Ida Noyes Hall; and that from Ida Noyes Hall they went to DeGrazia's home.

Police Officers Donald Paszkowski and Richard Bednarz testified that

on August 18, 1973, at approximately 2:45 a.m., they investigated a rape and robbery call. They arrived at the home of Nancy LaPaglia, 5222 South Kenwood, between 2:45 and 3 a.m. They obtained a description of the two assailants from the victim. She informed the police she had been raped and robbed and then described her molesters. Paszkowski testified that one of the men was described as wearing brown pants with a red T-shirt. The other man was described as having braided hair and wearing a blue jacket without sleeves and tan pants cut off at the knees. Paszkowski said Arnold disagreed with the victim's description of the color of the T-shirt and told the police that it was brown. After the above descriptions were sent out over the police communications system, the police took the victim to Billings Hospital for a medical examination.

Cecil Young, a police officer for the City of Chicago, testified that in the early morning hours of August 18, 1973, he and his partner, Police Officer Rewers, were assigned to a disturbance at the East End Park Lounge, 1652 East 53rd Street, Chicago. They arrived at the scene of the disturbance at approximately 3:10 a.m. and as they were taking a battery victim back to the squad car they heard a flash message. After hearing the message, the officers observed two males walking north through the alley between Hyde Park and Cornell. The men left the alley and came past the squad car, and Young asked them to step over to the squad car for a second. Young told Rewers to ask for a repeat on the broadcast of the two offenders. Young testified that the description of the clothing fitted that worn by the men and that they were placed under arrest and handcuffed. He said Sanders was wearing a Levi jacket with the sleeves cut off and a pair of light green pants, which appeared to be army fatigues. These pants were cut off at the knees and split up the leg approximately an inch or an inch and a half. Young also said Sanders was wearing a black derby and his hair was braided. Young said Davis was wearing light brown slacks, but he could not recall what else Davis was wearing. Young stated Sanders and Davis were taken to Billings Hospital; that at the hospital he saw Sanders and Davis sitting adjacent to some policemen; that the victim left the emergency room and walked back towards Sanders and Davis; and that Sanders got up and said, "Lady, tell these policemens that I didn't rape you." Young further testified that after arresting the two defendants, they were patted down but they did not have any weapons; that he thinks the police found some money; and that he did not know whether they found a wallet in the possession of either of the men.

George A. Spreyne, a micro-analyst for the Chicago Police Department Crime Detective Lab, testified that there were spermatozoa on the swab specimen taken from the victim at the hospital; that there was blood on Sanders' undershorts; and that the blood on Sanders' undershorts was the

same type of blood as that taken from the victim and from the Tampax, which was found in the alley.

Sanford Niles, a witness for defendant Sanders, testified that he was one of the two bartenders on duty at the East End Park Lounge on the night of August 17 and the early morning hours of August 18, 1973; and that Davis was in the tavern between 10:30 and 11 o'clock on August 17. Niles said Davis stayed several hours and then left the tavern; that Davis returned to the tavern between 2:30 and 3 a.m., with John Sanders; and that they stayed until a little after 3 a.m.

On cross-examination, and over objection of defense counsel, Niles testified that he had a conversation with Police Officers Conley and McKimmon on March 20, 1974, at 10:30 a.m., in his home; that the police officers took notes; that at the time he told the police officer he recalled Davis and Sanders entering the tavern numerous times the night of August 17 and August 18, 1973; that around 2 a.m. or 2:15 a.m., he noticed them exit; and that approximately 25 to 30 minutes later he saw them arrested as they were returning to the tavern. Defense counsel contended that it was error for the State not to tender him a copy of the statement prior to cross-examination. The court said the objection came too late, because the defense placed the witness on the stand and, therefore, the State can attempt to impeach him by some previous statement, which the court said appeared to be inconsistent. After the court's ruling, the assistant State's Attorney did not further interrogate Niles' relative to the purported statement.

John Sanders, one of the defendants, testified that he was taking bongo lessons at the 25th Street Beach at approximately 5:30 on the evening of August 17, 1973; that he left the beach at approximately 1:45 a.m. on the morning of August 18, 1973; and that he proceeded to the East End Park Lounge where he met Davis. He said they entered the lounge at approximately 2 a.m. and both ordered a glass of beer; that they remained in the lounge until approximately 2:45 a.m.; and that shortly after leaving the lounge, they were arrested. Sanders said the police took his pants and his swimming trunks from him at the police station; that prior to August 18, 1973, he had ruptured himself which caused internal hemorrhaging; and that as a result there were drops of blood in his urine. Sanders stated that at no time did he grab the victim or Walter Arnold; that he was never in an alley located at approximately 5222 South Kenwood, Chicago; that he never had intercourse with the victim; and that he did not take any money from Walter Arnold.

■■ Defendants contend that their convictions for rape and robbery should be reversed because they were based on vague, doubtful, uncertain and inconsistent testimony, in contrast to the convincing explanation of the defendants' whereabouts as furnished by their alibi

witnesses. In rape cases, the courts of review are charged with a special duty to carefully examine the evidence. *(People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612.) However, in such an examination, courts of review should not encroach upon the function of the trier of fact to weigh the credibility and otherwise assess the evidence presented at trial. *(People v. Springs* (1972), 51 Ill. 2d 418, 283 N.E.2d 225.) The trial court's finding will not be reversed on appeal unless the evidence is so unsatisfactory as to create a reasonable doubt of defendant's guilt. *(People v. Scott* (1972), 4 Ill. App. 3d 279, 280 N.E.2d 715.) The testimony of the complaining witness alone, if positive and credible, is sufficient to sustain a conviction of rape even though contradicted by the accused. *People v. Davis* (1957), 10 Ill. 2d 430, 140 N.E.2d 675; *People v. Kincaid* (1974), 21 Ill. App. 3d 851, 316 N.E.2d 220.

In the case at bar, the testimony of the victim overwhelmingly indicates that she was raped by the defendants. Her identification of the defendants was confirmed by Walter Arnold and the police officers. In addition, the police micro-analyst testified that the sample of blood found on Sanders' undershorts matched those taken from the victim and from the Tampax found in the alley.

True, there were discrepancies between the identification of the victim and Walter Arnold as to the wearing apparel of the assailants. There were also discrepancies as to when and where she and Arnold met and the lighting conditions in the alley. Also, defendants argue that the identification of the defendants by the two witnesses are open to suspicion because they did not mention Sanders was wearing a black derby, while Police Officer Young testified that Sanders was wearing a black derby at the time of the arrest. Police Officer Bednarz also testified Sanders was wearing a derby while he was in the hospital. However, discrepancies, as well as any weaknesses in the manner in which the identification is made, only affect the credibility of the witnesses and the weight to be given to their testimony. Where, as here, there are discrepancies, it is the task of the trier of fact to evaluate the weight to be given to the discrepancies. *(In re Williams* (1974), 24 Ill. App. 3d 593, 321 N.E.2d 281.) The significant issue here is not whether there are discrepancies between the victim's testimony and that of other witnesses, but whether, under the facts and circumstances, an adequate opportunity for a definite identification existed. Where, as here, the State has presented sufficient evidence as to defendant's identity, the question becomes one of credibility. *People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194.

Defendants' defense was an alibi. The testimony of defendants' alibi witnesses was to the effect that the defendants were in the East End Park Lounge, 1652 East 53rd Street, Chicago, during the time that the victim

was supposedly raped. Defendants contend that the evidence of the State's witnesses, when considered against the testimony of the alibi witnesses, did not prove defendants guilty beyond a reasonable doubt. Contradictions of testimony affects the credibility of the witness, and when this occurs, the degree of credibility and the weight to be given the testimony are matters for determination by the trier of fact. *People v. Novotny* (1968), 41 Ill. 2d 401, 244 N.E.2d 182.

■■ The victim was positive and certain in her in-court identification of the defendants. Her testimony was corroborated by Arnold. The test of a positive in-court identification is not whether a witness gives a full description of the features and clothing of the identified person. Rather, it is whether the witness was close enough for a significant length of time under conditions adequate for observation, and thus to make the identification. *(People v. Canale* (1972), 52 Ill. 2d 107, 285 N.E.2d 133.) Therefore, the fact that the victim was confused as to the color of the T-shirt worn by Davis, and whether she correctly described defendants' facial characteristics did not make her in-court identification of the defendants insufficient. Precise accuracy in describing the facial characteristics and clothing of the defendants is not necessary where the identification is positive. *(People v. Neeley* (1974), 18 Ill. App. 3d 287, 309 N.E.2d 725.) At best, these details affect the weight to be given the identification testimony. *In re Williams* (1974), 24 Ill. App. 3d 593, 321 N.E.2d 281.

Defendants next contend that the trial court committed reversible error when it denied a defense motion to require the State to produce copies of statements of a defense alibi witness made to State agents. The above statements were made by Sanford Niles, a bartender at East End Park Lounge who was called by defendants to establish that defendants were in that lounge at the time of the rape and robbery. After establishing that its investigators had questioned Mr. Niles at his residence and had taken written notes during such questioning, the State on cross-examination asked Mr. Niles if he had told the investigators that defendants had entered and exited the bar numerous times that night and that at approximately 2 or 2:15 a.m. he noticed them exit and that they returned approximately half an hour later. Counsel for defendants objected to the above statement and moved to obtain a copy of the entire statement which Mr. Niles gave to the investigators. The State objected and the trial court denied defendants' motion stating that it came too late. Mr. Niles was then asked again if he had made the above statement to the investigators and Mr. Niles responded affirmatively. Mr. Niles was then excused as a witness.

We believe that the trial court erred in denying the above motion. Mr.

Niles' written statement could have contained additional information explaining the portion of the statement elicited by the State on cross-examination. Unable to obtain a copy of the entire statement and unaware of its existence before trial, defendants' attorney was incapable of rehabilitating Mr. Niles as a witness. A situation similar to that in the instant case arose in *People v. Borella* (1935), 362 Ill. 218, 199 N.E. 113. In *Borella,* the prosecuting attorney while cross-examining one of the defendants read from what appeared to be a written statement. The prosecuting attorney inquired of defendants if they had been asked certain questions and if they had given certain answers. At the close of cross-examination defendants' counsel moved to see the document so that he could further examine the defendants and make an explanation if desired. The trial court denied the motion. On appeal the Supreme Court in *Borella* said that this was error. We similarly feel that the trial court in the instant case should have allowed defendants' motion to see Mr. Niles' written statement.

We note that this court in *People v. Fields* (1973), 12 Ill. App. 3d 608, 298 N.E.2d 743, held that where the defendant has furnished the State with a list of alleged alibi witnesses, the State must upon proper request furnish defense counsel with any statements subsequently taken from such witnesses. After granting leave to appeal the Illinois Supreme Court specifically stated in *People v. Fields* (1974), 59 Ill. 2d 516, 322 N.E.2d 33, that it did not reach the above question. Similarly we do not reach this broad question and instead hold that under the circumstances of this case, in which the State used a written statement of an alibi witness for impeachment purposes, the State was bound by fair play and substantial justice to provide the defense with a copy of the entire written statement.

While we do believe that the trial court erred in denying defendants' motion to require the State to produce a copy of Mr. Niles' statement, we conclude that the trial court's denial of this motion was at most harmless error. Mr. Niles testified on direct examination that he first saw Davis at 10:30 or 11 p.m. the evening of the incident and that Davis stayed for several hours in the lounge. Davis then left the lounge and returned with Sanders at 2:30 or 3 a.m. Mr. Niles then saw defendants arrested shortly after 3 a.m. On cross-examination Mr. Niles stated that Sanders and Davis came in at 2 a.m. and stayed until 3 a.m. and that during that period of time he did not recall their leaving. Mr. Niles saw defendants exit the lounge twice that evening. On recross, Mr. Niles stated that he did not see defendants between 2 a.m. and when they were arrested.

Reviewing Mr. Niles' testimony we find it confusing and internally inconsistent. His testimony is also inconsistent with the testimony of one of the defendants, Sanders, who testified that he left the lounge with

Davis at about 2:30 a.m. and that he and Davis were arrested as they returned to the lounge at about 3 a.m. Mr. Niles testified that he did not recall the defendants leaving the tavern between 2 and 3 a.m.

Given the confusing nature of Mr. Niles' testimony, the internal inconsistencies contained therein, and the inconsistency of his testimony with that of defendant Davis, the State's interrogation of Mr. Niles based on the contents of his statement was used without any significant effect and its use could not have affected the trial's result. (See *People v. Fields* (1974) 59 Ill. 2d 516, 322 N.E.2d 33.) An accused is entitled to a fair trial, not a perfect trial. *(People v. Robertson* (1966) 74 Ill. App. 2d 360, 220 N.E.2d 5.) Given further the overwhelming evidence of defendants' guilt, it is apparent that the trial court could not have reached a different decision and that the inability of defendants to examine the statement of Niles did not operate to deny the defendants a fair trial. The trial court's denial of defendants' motion to require the State to produce Mr. Niles' statement was harmless error beyond a reasonable doubt.

We find no reversible error in the record and therefore affirm the judgments of the circuit court of Cook County.

Judgments affirmed.

MEJDA, P. J., and McNAMARA, J., concur.