THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LENARD CARLTON, Defendant-Appellant.

First District (1st Division)    No. 78-1365

Opinion filed November 26, 1979.

Howard T. Savage, of Chicago (Howard O. Edmonds, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and James L. Alexander, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Lenard Carlton, was charged by indictment with two counts of armed robbery. (Ill. Rev. Stat. 1973, ch. 38, par. 18—2.) Following a bench trial, he was found guilty and sentenced to serve from 4 to 10 years in prison. Defendant appeals, contending (1) that his lineup was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process, and (2) that he was not proved guilty beyond a reasonable doubt.

We affirm.

Mrs. Ella May Catledge testified that on April 11, 1975, she was working at the grocery store she owned and operated in Chicago, Illinois. Around 10:35 a.m., Catledge went to the back room of the store. Her brother, Melvin Keys, was working in the front shopping area. Two men, one of whom Catledge subsequently identified as defendant, entered the store. Catledge remained in the back room, but heard their voices. One man asked to purchase some salami. The second man added, "Don't forget the cheese." Catledge then got up to see if her assistance was needed. She stood in the hall leading to the meat counter and observed the two customers. Catledge testified that defendant was one of those customers. She then saw defendant put a gun to her brother's head and announce, "This is it." Defendant forced Keys to lie down on the floor of the rear room. Catledge observed the other man take Keys' wallet.

Catledge further testified that the other man knocked over some scales and pushed her. She fell over some boxes in the hall. Defendant then forced Catledge and Keys into the "cooler" storage area and locked the door. Once inside the cooler, Catledge noticed that her brother's head was bleeding.

Catledge and Keys remained locked in the cooler for about three minutes until Steven Keys, Melvin's son, unlocked the storeroom. According to Catledge, examination of the store revealed that the cash register, meat case and display case all had been emptied. A handgun was also missing from the store.

Catledge also testified that on April 19, 1975, she observed a lineup. Two detectives took her to the police station; enroute they told her they were taking her to a lineup to make a positive identification of the robber or robbers. Catledge observed five men and picked defendant as the assailant. She also made an in-court identification of defendant.

On cross-examination, Catledge described the robber she believed to be defendant as 6 feet 2½ inches tall and weighing 170 pounds. She testified that defendant had facial hair at the time of the robbery but that he didn't have facial hair when the lineup picture was taken. Defendant was wearing a black leather coat and black shirt during the robbery. Catledge did not give the police a description of the robbers. According to Catledge, on April 19 the police told her they wanted her to come to the station and make a positive identification.

On redirect examination, Catledge explained that the day of the robbery defendant had facial hair all around his face. At the lineup he had no facial hair, but Catledge identified him from his profile.

Melvin Keys testified that he helped Catledge run the grocery and was working at her grocery on April 11, 1975. At about 10:30 a.m. Catledge was in the back room when two customers entered the store. One individual asked to purchase some salami. Keys identified the other individual as defendant. Defendant said, "What you order so much for? You know I want some cheese." At this time Catledge walked from the back room and came into the store. Keys wrapped the salami and began to walk toward the cash register.

Keys further testified that defendant grabbed his shoulder, put a gun to the back of his head and told him, "This is it." The other man knocked some scales over, pushed Catledge down and stood over her. Defendant forced Keys into the back room and made him lie face down on the floor. He then removed Keys' wallet containing $400. Defendant next ordered Keys to get up and said, "If I find out that you lied about any more money in here, I am going to kill you." He then struck Keys on the forehead with the gun and said, "I ought to kill you anyway."

Keys and Catledge were locked in the cooler, but were released in less than five minutes by Keys' son. Keys discovered that all the meat in the display case was gone and that the cash register was emptied. Keys identified defendant in court as the individual who took his wallet.

On cross-examination, Keys testified that after the police arrived he gave a description of the man who robbed him. He was a young, black

man, with a dark complexion, 140 to 150 pounds, and 6 feet to 6 feet 4 inches tall. Keys testified that the individual who robbed him had a thin mustache and wore a black leather coat and dark clothes.

Steven Keys testified that on April 11, 1975, at about 10:45 a.m., he drove to Catledge's grocery store. He parked in front of the store and saw two men leaving, carrying a box of uncovered meat and cutlery. On the basis of past observation, Keys testified that his aunt and father always packaged the meat they sold. The men quickened their pace and got into a car parked two car lengths in front of Keys' car. Keys described their car as a two-toned red and white 1967 or 1968 Plymouth. He memorized the license number of the vehicle: VX 4772. As the men exited, they almost hit another car.

Steven Keys further testified that at that point he panicked and ran into the store. The store was in disarray, cash registers opened, the scale knocked down and cake racks scattered. Keys shouted for his father. His aunt responded that his father was dead and that she was locked in a storage area. Keys unlocked the door and found his father was inside and bleeding from the head. He described his aunt as being "hopping mad." Keys then wrote down the license number of the car he had witnessed and called the police.

When the police arrived, Steven Keys described the two men. He described one as tall and thin, about 6 feet 2 inches or 6 feet 3 inches tall. This man was wearing a black leather coat. Keys made an in-court identification of defendant as the tall, thin man he had observed on the day of the robbery. Keys also gave the police a description of the get-away car and gave them the license plate number. About a week after the robbery, Keys saw the same car in a police parking lot.

On cross-examination, Steven Keys testified that he viewed the two men, including their faces, for a matter of seconds or moments. He stated that the tall man weighed between 150 and 160 pounds. Keys explained that he didn't see this man up close and couldn't tell if he had hair on his face. He testified that he had thin, angular features. Keys could not remember if he told the police the car was in a ragged condition. He testified that it was dirty. He told the police the body of the car was red. The car he saw in the police parking lot was red and white and was washed and waxed. Keys explained he could have told the officers that the car was "ragged" because it was filthy.

On redirect-examination, Steven Keys explained that he observed the robbers' faces when they came out of the store and when they paused and looked at him. As they walked quickly to their car, he could see the sides of their faces. He also observed their faces when they put the boxes of meat in their car.

At this point, a State's exhibit, consisting of defendant's 1975

application for Illinois license plate number VX 4772, was admitted into evidence.

Allen Szudarski, a Chicago police officer, testified that on April 19, 1975, at about 11:30, he proceeded to defendant's residence in Chicago. Szudarski observed a white over red Plymouth, bearing the license plate number VX 4772, parked across the street. Szudarski then proceeded to defendant's home and was allowed entry. He informed defendant that his car had been used in the commission of a crime. Szudarski also noticed that defendant fit the general description of one offender given in the case report. Defendant was transported to police headquarters, advised of his *Miranda* rights and placed in a lineup.

After the lineup. Szudarski again informed defendant of his rights, told him he had been identified by the robbery victim and asked him who was with him at the time of the robbery. Defendant said he was with Darryl Chatfield and that if the person said that he committed the robbery, he must have committed the robbery.

Officer Arnold Kelly testified that he was present at defendant's lineup on April 19. Before Catledge viewed the lineup, Kelly informed her that the police had apprehended suspects. On cross-examination, Kelly admitted making a police report stating that defendant was questioned after the lineup and said he had no knowledge of the offense and that he was with Darryl Chatfield on April 11.

Arla Carlton, defendant's wife, testified for the defense. She stated that on April 11, 1975, defendant drove her to 1 East Wacker Drive and dropped her off for work at about 9:30 a.m. The car which defendant was driving was a 1966 white over red Plymouth. According to Arla Carlton, the car was clean and in "good shape." She also testified that defendant was wearing a beige leather jacket, maroon pants and a white turtleneck sweater. She testified that her husband had no facial hair on April 11. She did not remember if he had a mustache; if he did, it was light.

On cross-examination, Arla Carlton stated that defendant had grown mustaches in the past and was growing one several days prior to trial. She also explained that her husband had left the army one month before the robbery and had been looking for employment during that period.

Emma Carlton, defendant's mother, testified that on April 11, 1975, before 10:30 a.m., defendant arrived at her home in his car. She remembered the exact time because she always watched a television program beginning at 10:30 a.m. She testified that she had never seen her son wearing a black jacket. On cross-examination, Emma Carlton testified that she saw defendant while she was watching her program when defendant entered the kitchen to get some food. Defendant worked on his car and left at about noon.

Paul Mackey, a sergeant with the Illinois National Guard, testified

that he had known defendant since March 1975, when defendant requested admission to the Army National Guard. Mackey had read defendant's records prior to his entry and found them to be in order.

Reverend Willie Sercye testified that the defendant's reputation in the neighborhood was good.

Defendant testified in his own behalf concerning his arrest and lineup appearance. After the lineup, two officers asked defendant questions about a friend of a certain height and complexion. He informed the officers that he did not know anyone fitting that description, but became scared and gave them the name of Darryl Chatfield, his one friend since returning to Chicago.

Defendant next testified concerning his whereabouts on April 11, 1975. His testimony substantially corroborated that offered by his wife and his mother. He testified that on April 11 his car was clean and in very good condition. After driving his wife to work, defendant did not change from the beige jacket, white sweater and maroon pants. He stated that he did not have any facial hair on that date. He denied seeing Catledge or Melvin and Steven Keys on the 11th and denied participation in the robbery. Defendant also testified that only one person in the lineup was as tall as he was. Defendant indicated he was 6 feet, 2½ inches tall, and claimed he weighed 189 pounds, but weighed less on April 11, 1975.

On cross-examination, defendant stated that the color of his car most apparent to the eye was red. He did not lend his car to anyone on April 11, 1975. Defendant denied making the statement to police officers, "If they said I committed it, I must have."

Officer Nyblom was the final defense witness. Nyblom testified that Steven Keys told him the robbers' car was a red Buick or Plymouth. Nyblom wrote in his police report that the car was a 1968 or 1969 Buick in ragged condition parked one-half block from the grocery store.

Following closing arguments, the court found defendant guilty and subsequently imposed a 4- to 10-year sentence.

## I.

Defendant asserts that he was denied due process because his pretrial lineup was unnecessarily suggestive and conducive to irreparable mistaken identification in violation of *Neil v. Biggers* (1972), 409 U. S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.

The State initially contends that defendant has waived this issue by neither moving to suppress testimony regarding the lineup before or during trial nor objecting to this testimony. We recognize that the State's position has merit (see *People v. Pierce* (1972), 52 Ill. 2d 7, 10, 284 N.E.2d 279); however, since we resolve defendant's contention on a different basis, we will not address the waiver issue.

■■ Defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968), 390 U. S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Courts must look to the totality of the circumstances in evaluating this claim. (*Biggers.*) In *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, the court made clear that *Biggers* involved a two part test. Even if a lineup proved unnecessarily suggestive, reliable testimony establishing an independent origin for the identification would be admissible. The burden of proving reliability rests on the State. *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152; *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157.

The *Manson* court rejected a *per se* rule of exclusion of identification following unnecessarily suggestive confrontation procedures, and adopted a balancing test (432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243):

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony * * *. The factors to be considered are set out in *Biggers*. 409 U.S., at 199-200. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself."

Defendant claims that his lineup was unnecessarily suggestive in two respects: (1) the police implied to Catledge that one of the men who robbed her in the store was in the lineup, and (2) the other participants in the lineup were grossly dissimilar to him. Defendant does not specifically challenge Catledge's in-court identification.

According to Catledge, the police told her they were taking her to make "a positive identification." The officers made no other remarks to her. Officer Kelly testified that he only informed Catledge that the police had suspects. In our view, neither of these remarks would taint the identification procedure.

In *People v. Williams* (1969), 117 Ill. App. 2d 34, 43, 254 N.E.2d 81, the court resolved this issue, stating:

> "* * * When a witness is asked to view a lineup, there is, necessarily, an implied suggestion that the police investigation has led them to believe that one of the persons exhibited in the lineup may have committed the crime. * * *"

See also *People v. Norfleet* (1972), 4 Ill. App. 3d 758, 281 N.E.2d 761.

█ We find the officers' remarks merely verbalized the obvious and were neither suggestive nor prejudicial.

We turn next to defendant's contention that other lineup participants were grossly dissimilar in appearance. The record, including the photograph of the lineup, indicates significant differences between the size and appearance of defendant and the other participants. We assume *arguendo* that the other lineup participants were "grossly dissimilar" to defendant and that the confrontation was unnecessarily suggestive. Nonetheless, we believe that application of the factors set forth in *Biggers* demonstrates the reliability of Catledge's pretrial identification.

First, Catledge had an excellent opportunity to view the offenders at the time of the crime. The strength of an identification depends upon whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation. (*People v. Castillo* (1976), 40 Ill. App. 3d 413, 419, 352 N.E.2d 340.) Catledge came to the front of the store when she heard defendant's voice. She watched her brother wait on defendant and his accomplice. She then observed defendant pull out a gun and hold it to her brother's head. She also observed defendant when he locked her and her brother in the cooler. There is no evidence in the record that Catledge's view was restricted or that she was ever at a great distance from defendant. The robbery occurred at about 10:30 a.m., when lighting conditions were favorable. Finally, there is no evidence that defendant was masked or had otherwise concealed his identity. These factors also indicate that Catledge exhibited a sufficient degree of attention toward the customers turned assailants to satisfy the *Biggers* test.

The accuracy of the witness' prior identification is another factor mentioned in *Biggers*. Because Catledge did not provide the police with a description of the offenders, we view this as a neutral factor. Finally, Catledge made a positive identification of defendant at the lineup, identified defendant at trial and picked him from the lineup photograph at trial. The robbery occurred on April 11, 1975, and the lineup was held on April 19, 1975. Thus, Catledge exhibited a sufficient degree of certainty at the confrontation and there was a relatively short time span between the crime and the lineup confrontation.

█ Balancing these factors against the discrepancies in size and appearance between defendant and the other lineup participants convinces us that Catledge had a sufficient independent basis for her lineup identification of defendant. Accordingly, defendant was not deprived of due process.

## II.

Defendant also contends that he was not proved guilty beyond a

reasonable doubt. Specifically, he challenges the testimony of the State's witnesses and asserts that his alibi defense was not impeached.

■■ A reviewing court will not reverse a criminal conviction unless the evidence adduced at trial is so improbable or so palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) In a bench trial, the trial court must determine the credibility of witnesses, the weight to be afforded their testimony, and resolve conflicts in testimony. (*People v. Glaze* (1977), 48 Ill. App. 3d 523, 362 N.E.2d 1287.) Minor discrepancies or omissions in description testimony do not affect the validity of the identification of the accused; rather they affect the weight afforded the testimony. (*People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.) The credible identification testimony of one eyewitness is sufficient to support a finding of guilt. *People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601.

In the instant case, three witnesses were close enough to the accused for a sufficient length of time under conditions adequate for observation. The favorable circumstances surrounding Catledge's and Melvin Keys' observations inside the grocery are noted above. Steven Keys had the opportunity to view the offenders as they walked out of the store, walked to their car parked two car lengths in front of him and drove off. This occurred at about 10:45 a.m., and Steven Keys had an unobstructed view. Catledge testified that defendant was wearing a black leather coat when he committed the robbery. She described him as a dark-complected man, who weighed 170 pounds and was 6 feet 2½ inches tall. She believed defendant had facial hair at the time of the robbery. Melvin Keys stated that defendant was wearing dark clothing, including a black leather coat. According to Keys, defendant had a dark complexion, weighed 140 to 150 pounds and was between 6 feet and 6 feet 4 inches tall. Keys stated that defendant had a thin mustache. Steven Keys recalled that one of the robbers was thin and about 6 feet 2 or 3 and was wearing a black coat.

■■ In sum, all three witnesses identified defendant at trial as one of the robbers. Additionally, Catledge identified defendant at the lineup. Moreover, their descriptions of the robber were substantially similar and matched the defendant's general appearance.

Steven Keys' description of the getaway car also supports the verdict. He told a police officer that the car was a 1968 or 1969 red Buick or Plymouth. Defendant's car was a 1966 white over red Plymouth. He also memorized and wrote down the license number of the getaway car. That number matched the license number of defendant's car. Moreover, Steven Keys positively identified defendant's car as the getaway car when he saw it at the police impoundment lot.

Defendant points out several discrepancies concerning the State's case. These include variances in descriptions of defendant and Catledge's

testimony that defendant had facial hair at the time of the robbery. Additionally, he complains that Steven Keys' description of the getaway car was inaccurate. In our view, defendant's assertions only raise minor discrepancies that affect the weight of the evidence but do not affect the verdict. *People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.

Finally, defendant contends that his alibi defense creates a reasonable doubt as to his guilt. Alibi was established by the testimony of defendant and his mother which contradicted the State's witnesses. Where the evidence is conflicting, it is the province of the trier of fact to ascertain the truth. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) We will not substitute our judgment as to the credibility of the alibi testimony.

Accordingly, the conviction and sentence are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.