**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200219-U

Order filed March 28, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0219 Circuit No. 18-CF-519 |
| | ) | |
| DAISHA C. FERNANDO, | ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Justices Daugherity and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: Evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 2      Defendant, Daisha C. Fernando, appeals from her conviction for aggravated discharge of a firearm. Defendant contends that the State failed to prove her guilty beyond a reasonable doubt, arguing that the basis for her conviction rested on an incredible eyewitness's testimony. We affirm.

¶ 3                           I. BACKGROUND

¶ 4 The State charged defendant with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)). The charges stem from a July 27, 2018, incident where gunshots were fired at an occupied vehicle operated by Giavanni Pates. Defendant's case proceeded to a bench trial.

¶ 5 Officer Brett Lawrence of the Peoria Police Department testified that at approximately 7:11 a.m. on July 27, 2018, he was dispatched to West Starr Street on two ShotSpotter alerts. He explained that ShotSpotter was a program that detects gunfire. Lawrence discovered two shell casings in front of 3008 West Starr Street. There was no one in the immediate area to speak with regarding the shooting. He relocated to the victim's residence where he spoke to Pates and observed the vehicle that she had been driving that morning. The front driver's side window was shattered and there were bullet holes in the rear driver's side door.

¶ 6 Pates testified that on July 27, 2018, she had an argument with her boyfriend, Darryl Keller, via text messages. At approximately 7 a.m., Pates left her residence to buy cigarettes, and attempted to locate Keller.

¶ 7 While stopped at a stop sign, Pates observed Keller walking on Starr Street with defendant. Pates knew of defendant prior to that morning. Pates had argued with defendant over Facebook messenger regarding Keller in May or June 2018. Pates did not provide proof of this argument to detectives since they indicated they had already found proof of it. Pates had seen defendant around town on two occasions but had never met her in person. To Pates's knowledge, defendant had three Facebook accounts.

¶ 8 After seeing Keller on Starr Street, Pates stopped her car on the left side of the street where Keller and defendant were standing. Pates remained seated in her vehicle with the driver's side window rolled halfway down. Pates identified defendant in open court as the individual she saw with Keller. Defendant was standing to the side of Keller but a couple of inches or feet behind him

2

and positioned diagonally from him. Defendant wore a black jogging suit with a hooded jacket and white T-shirt underneath. Defendant was not wearing makeup. Pates could not remember how defendant wore her hair but thought that defendant had her hood up. She observed an object hanging out of defendant's jacket and stated defendant "had her hand in her pocket like this," referencing the position of defendant's right hand. When asked how she recognized defendant, Pates answered, "because they was together." Pates stated, "I could see her face and I knew what she looked like," indicating that familiarity resulted from her "studying [defendant's] Facebook photos."

¶ 9       As Pates and Keller argued, defendant muttered something to the effect of "what the fuck you looking at." As the argument ended, Pates indicated that she was leaving and told Keller to call her or come by her house. While waiting for Keller to answer her question, defendant again said: "what the fuck you looking at[?]" Defendant pointed what Pates described as a silver barreled gun with possibly a black handle at Pates and fired it. Pates believed she entered a state of shock. She said, "I just remember her pointing it at me, and that was the last thing I saw and remember."

¶ 10      The first gunshot broke the driver's side window of Pates's vehicle. She then heard two more gunshots. She attempted to turn her vehicle around to return home to call 911. Pates had trouble remembering facts about how she maneuvered her vehicle, calling 911, and when officers arrived at her residence. Pates testified that when she arrived home, an officer was at her residence; however, she also testified that she called 911 from another phone at her residence. She explained that she could not remember if she called 911 or if officers were waiting when she returned home.

¶ 11      Pates testified regarding an incident with defendant the day prior to the shooting. On that day, both Pates and Keller were at the Starr Street residence and defendant wrote a message on Pates's vehicle that said, "Bitch you not done with me." Defendant posted photographs of the

vandalism on her Snapchat and Facebook page. Pates viewed the photographs on Facebook. A photograph of defendant's post was entered into evidence. On cross-examination, Pates testified that Keller often borrowed her vehicle. She specified that he never drove the vehicle out of town.

¶ 12    Pates spoke with Detective Scott Hulse at the Peoria Police Department regarding the shooting. Initially, she did not disclose to Hulse that she had been looking for Keller that morning. Pates identified defendant as the shooter by showing Hulse defendant's Facebook account. Pates was unable to select defendant from a photographic lineup. She explained that she had primarily seen defendant on her Facebook accounts where her appearance would frequently change, and that defendant did not look like the lineup photograph in real life.

¶ 13    Officer John Foster of the Peoria Police Department testified that he gathered evidence at the scene on July 27, 2018. He photographed and collected two 9-millimeter shell casings from the sidewalk in front of 3008 West Starr Street. He then collected evidence from Pates's vehicle. He observed two bullet holes in the driver's door and an interior bullet hole in the driver's side rear passenger door. It appeared that one bullet had entered the driver's door, fragmented, and exited the driver's side rear passenger door. He cut open the driver's seat and retrieved a bullet. He also recovered a bullet that had fallen onto the roadway when the driver's side rear vehicle door was opened prior to his arrival. Photographs of the damage and collected items were admitted into evidence.

¶ 14    The parties presented two verbal stipulations. Detective David Dailey of the Decatur Police Department would testify that he used a program to unlock defendant's password protected phone. Detective Stevie Hughes of the Peoria Police Department would testify that he downloaded the contents from defendant's unlocked phone.

¶ 15        Hulse testified that after he responded to the scene, he met with Pates. She showed him two of defendant's Facebook accounts and identified defendant as the shooter. Hulse found a photograph of defendant's driver's license and was able to identify defendant. Hulse secured a search warrant for defendant's cell phone. Various exhibits from the phone were admitted into evidence. The court reviewed a series of photographs depicting defendant holding a handgun but declined to admit them into evidence. A video of defendant's interrogation was admitted into evidence. Hulse testified that defendant told him that she had been out of town the night of July 26, 2018, and had arrived at her mother's house the morning of the shooting. A video from defendant's cell phone showed that she was in Peoria at the time she told the detective that she was out of town.

¶ 16        Hulse testified that he found no evidence on defendant's cell phone of any arguments or altercations between defendant and Pates. He also testified that the date range for the records requested by the warrant were for a "very tight window" of time, yielding limited amounts of data. There was no other evidence provided to Hulse of any argument between Pates and defendant.

¶ 17        Defendant testified that she did not know Pates until she was questioned by the police regarding the shooting. When asked about the vandalism to Pates's vehicle, she admitted to leaving the message, but she believed that the vehicle belonged to Keller. Defendant frequently saw Keller driving the vehicle, and they had gone out of town overnight in it in June 2018. Defendant intended the message for Keller.

¶ 18        Defendant explained that she misstated the date when she told Hulse she was out of town on the night of July 26, 2018, when it was July 25, 2018, and she returned the morning of the vandalism to Pates's vehicle. Defendant was supposed to meet Keller at the Starr Street house, and he failed to answer the door or his phone when she arrived. She knocked on the door of the house

5

and honked her horn repeatedly for an hour with no answer. She wrote the message on Pates's vehicle, intending it for Keller. Defendant's mother testified that she saw Keller driving Pates's vehicle every day.

¶ 19    In rebuttal, Pates testified that she only owned one vehicle and while she let Keller borrow it sometimes, it was not every day. She testified that she did not remember if she loaned it to Keller for two days in June 2018. When asked again about the vandalism, Pates testified that she left her vehicle there overnight as she had been drinking and went back in the morning to retrieve it. It was at that time she first saw the message. She saw the Facebook posting later that day.

¶ 20    After arguments were heard, the court found defendant guilty. It reasoned that the wording on the message written on Pates's vehicle indicated that defendant intended it for Pates, not Keller. The court found it strained credibility that defendant stayed at the house on Starr Street knocking and honking for that length of time and no one answered, especially if Keller knew she was coming. The court also found that, while it would have been more convincing if Pates had identified defendant in the photographic lineup, it was not necessary "given her clarity in identifying the defendant in—in another credible way." Regarding the testimony of Pates, the court stated: "the testimony of the victim at the scene of the occurrence and the inconsistencies, if you want to call them that, are understandable knowing that she acknowledges and it's believable that she was in a state of shock after the first round was fired off." Defendant was subsequently sentenced to five years' imprisonment. Defendant appeals.

¶ 21                                II. ANALYSIS

¶ 22    Defendant argues that the State failed to prove her guilty beyond a reasonable doubt of aggravated discharge of a firearm where the State's case was reliant on the testimony of one incredible eyewitness. Defendant contends that Pates's inability to positively identify defendant

6

and the fact that Pates's testimony contained numerous contradictions, inconsistencies, and impeachments rendered the evidence insufficient to sustain her conviction.

¶ 23 When reviewing the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting this inquiry, it is not the function of the reviewing court to retry defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The reviewing court must examine the record while bearing in mind that it was the trier of fact who saw and heard the witness. *Id.* Testimony of a single witness is sufficient to convict if the testimony is positive and the witness is credible. *Id.* Such testimony may be found insufficient only where the record compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. See *id.* at 545; *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991). While vague or doubtful identifications are insufficient to support a conviction, identification of the accused by a single eyewitness can support a conviction where that witness viewed the accused under circumstances allowing a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995).

> "[C]ircumstances to be considered in evaluating an identification include: (1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989).

¶ 24    Defendant was charged with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2018)). To prove the violation as charged, the State must present sufficient evidence that defendant knowingly discharged a firearm in the direction of a motor vehicle she knew or reasonably should have known to be occupied by a person. *Id.* The only element at issue in this appeal is whether the evidence established beyond a reasonable doubt that defendant was the person who knowingly discharged a firearm at Pates. We begin by evaluating the sufficiency of Pates's identification by applying the *Slim* factors.

¶ 25    First, we consider the opportunity Pates had to view the criminal. When considering this factor, we consider "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979). This interaction occurred during the daytime when Pates's view would not be limited by the ambient lighting. Pates stopped her vehicle close to defendant and Keller and began to argue with Keller. Defendant stood near Keller for the duration of the argument providing ample opportunity for Pates to observe defendant.

¶ 26    Second, the record establishes that Pates exhibited a significant degree of attention. Before the shooting, Pates sat in her vehicle near defendant for several minutes. Pates testified to numerous details concerning defendant's appearance, demeanor, and mannerisms prior to the shooting. Pates's testimony described where defendant was standing, how she was holding her hand, the object hanging from her hooded jacket, her comments to Pates, what defendant was wearing, and the fact that she was not wearing makeup that morning.

¶ 27    Third, although Pates was unable to select defendant from the photographic lineup on the day of the shooting, she reasonably explained that the lineup photograph looked different from defendant's Facebook photographs and did not resemble defendant's normal appearance.

8

Additionally, shortly after the shooting, Pates identified defendant by showing detectives defendant's Facebook account and indicating that defendant was the shooter.

¶ 28      Fourth, Pates exhibited a high level of certainty in her identification of defendant as the shooter. At trial, Pates unequivocally identified defendant as the shooter, stating that she knew it was defendant who fired the gunshots as she could see defendant's face and knew what defendant looked like. Pates also testified that she had seen defendant prior to the shooting both in person and on Facebook. Pates's trial identifications were consistent with the identification that she provided to the police after the shooting. Shortly after the shooting, Pates confirmed her identification by providing the police with photographs of defendant from defendant's Facebook account. The only time that Pates's identification wavered, was when the police provided her with a photographic lineup, and she was unable to identify defendant. However, as we noted with regard to the third element, this did little to undercut her other consistent and repeated identifications.

¶ 29      Fifth, the record establishes that minimal time passed between the shooting and Pates's identification of defendant as the shooter. Specifically, Pates identified defendant as the shooter on the day of the shooting, shortly after the shooting occurred.

¶ 30      We conclude Pates viewed the shooter under circumstances permitting a positive identification. Thus, when viewed in the light most favorable to the State, a reasonable trier of fact could have found Pates's identification of defendant as the shooter to be credible and prove beyond a reasonable doubt that defendant committed aggravated discharge of a firearm. See *Lewis*, 165 Ill. 2d at 356.

¶ 31      In reaching the above conclusion, we reject defendant's argument that Pates's testimony was so rife with inconsistencies that "nothing Ms. Pates testified to can be relied upon as fact." In this argument, defendant points to contradictory statements made by Pates, including but not

limited to: (1) she could not recall exactly how she turned her vehicle around after the shooting, (2) she heard three gunshots where the physical evidence showed only two, (3) she could not remember if or when she called 911, (4) she could not remember if police were waiting for her at her residence when she arrived home, and (5) she claimed that she argued with defendant online when no such evidence was provided to or located by detectives on defendant's cell phone. These inconsistencies were relevant mainly to the facts surrounding the offense. They do not undermine Pates's consistent and repeated identification of defendant as the shooter.

¶ 32                                    III. CONCLUSION

¶ 33        The judgment of the circuit court of Peoria County is affirmed.

¶ 34        Affirmed.